436 So.2d 328 (1983)
"Jane DOE," Appellant,
v.
SARASOTA-BRADENTON FLORIDA TELEVISION COMPANY, INC., Appellee.
No. 82-2517.
District Court of Appeal of Florida, Second District.
August 12, 1983.
*329 Alan D. Bennett of Klein & Bennett, P.A., Sarasota; and Mark R. Lewis, St. Petersburg, for appellant.
William H. Meeks, Jr., Bradenton, for appellee.
CAMPBELL, Judge.
The appellant, Jane Doe, was raped by a man who was later tried and convicted for that crime. After consulting with state prosecutors, appellant agreed to testify against her assailant at his upcoming trial. Important to her decision to testify was an assurance by the state that her name and photograph would not be published or displayed.
On March 10, 1982, appellant testified at the rape trial. Appellee's television news team was also present in the courtroom. That night, during the evening news, appellee ran a video tape of the trial featuring appellant's testimony. While the video tape ran, the newscaster identified appellant by name to the viewing audience.
Appellant filed a four-count complaint against appellee. In count I, she sought a declaration that she was a member of the class protected by section 794.03, Florida Statutes (1981).[1] In count II, she sought damages for a violation of that statute, and in counts III and IV, she sought, respectively, damages for intentional invasion of privacy and intentional infliction of emotional distress. Appellee moved to dismiss the complaint, relying primarily on the decision in Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). After receiving memoranda of law from the parties and hearing argument on the motion, the trial court dismissed counts I, II and III with prejudice on the basis of Cox Broadcasting and also dismissed count IV with prejudice. Appellant then filed this appeal, and we now affirm.
In Cox Broadcasting, the Supreme Court concluded that the State of Georgia could not punish a reporter and his employer for accurately publishing the name of a deceased rape victim where the information had been obtained from otherwise public judicial records. We agree with the trial court here that Cox Broadcasting controls. We conclude that the fact that the plaintiff in Cox Broadcasting was the deceased victim's father and the appellant here is the victim herself does not distinguish the cases. Like the plaintiff in Cox Broadcasting, appellant here is complaining about the publication of information which, though completely accurate, is embarrassing and painful. Like the defendant in Cox Broadcasting, appellee here, through its agents, obtained its information from a source already *330 open to public view. In Cox Broadcasting, the information came from public documents made available to a reporter during an ongoing judicial proceeding. In the instant case, the information came from a video tape taken without any apparent restrictions during the course of a public criminal trial. In neither case was there any indication that the press used improper methods to obtain the information disclosed. Also, the record in the instant case indicates that the state, despite its promise to appellant, never sought to restrain the video taping as it occurred nor objected to or otherwise sought to prohibit the video tape report of appellant's trial testimony. Apparently, the state never made any effort to ensure that appellant's name and picture remained closed to the public. Because the information was readily available to the public, through the vehicle of a public trial, we must therefore affirm on the basis of Cox Broadcasting.
Appellant alleged that appellee's conduct violated section 794.03. That statute is inapplicable to the facts of this case. However, by so holding, we do not conclude that the statute can never be invoked by persons seeking to shield themselves from public scrutiny. Justice White pointed out in Cox Broadcasting that the states are not completely helpless to provide protection to the privacy rights of their citizens. "If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information." 420 U.S. at 496, 95 S.Ct. at 1046, 43 L.Ed.2d at 350.
Thus, there certainly exist situations in which section 794.03 could be applied to protect privacy interests without running afoul of the first amendment. The same view has been espoused in an opinion of the attorney general that this statute would protect citizens when the information was not yet available for public inspection.
Prior to open public judicial proceedings, the name or other identifying information concerning victims of sexual assaults is not part of an open public record and may not be publicly disclosed in any manner by the custodian of such records. In the event such nonpublic information is obtained and printed, published, or broadcast prior to open, public judicial proceedings, the holding of Cox does not purport to prohibit the state from prosecuting those individuals who have violated s. 794.03, ... by publishing or broadcasting or causing to be published or broadcasted such identifying information.
1975 Op. Att'y Gen. Fla. 075-203 (July 14, 1975).
Although not raised by the parties, we note that Florida's constitutional right of privacy could provide, under circumstances not present here, a means of further protection for those wishing "to be let alone."[2] However, this state constitutional provision must yield to the federal constitution's guarantee of press freedom.
Although we affirm the trial court in all respects, we do so reluctantly because the information disclosed during the television broadcast appears to us to have been completely unnecessary to the story being presented. Withholding the name and photograph of the victim in this case would in no way have interfered with or restricted publication and dissemination of "news of the day." New Jersey State Lottery Commission v. United States, 491 F.2d 219 (3d Cir.1974), vacated and remanded, 420 U.S. 371, 95 S.Ct. 941, 43 L.Ed.2d 260 (1975) (Douglas, J., dissenting).
We deplore the lack of sensitivity to the rights of others that is sometimes displayed by such unfettered exercise of first amendment rights. While we shall remain ever attentive to protect inviolate these first amendment rights, we do so with the admonition that those rights should not be arbitrarily exercised when unnecessary and detrimental to rights of others. To do so only reminds us of the proverbial bull in the china shop. We hasten to add that we fully recognize that the appellee here did no legal *331 wrong nor any other conscious or deliberate impropriety, although its actions may have been insensitive. Nevertheless, it is that very lack of any sense of duty to the individual rights of others that concerns us here. Prior to this trial, appellant was simply an ordinary citizen; she lacked fame and prominence, the nature of which might make the publication of her name and visual image newsworthy, but she had the unhappy circumstance of becoming a victim of a crime. The publication added little or nothing to the sordid and unhappy story; yet, that brief little-or-nothing addition may well affect appellant's well-being for years to come.
We understand the difficulty of prosecuting a case such as this and the emotional trauma of a victim revealing some of her most private feelings. Despite our understanding of these difficulties, or perhaps because of it, we cannot resist the opportunity to chastise the state somewhat for not having sought a protective order regarding cameras in the courtroom or other proper steps to support its alleged assurance to appellant that her name and photograph would not be published. Any criticism of appellee is tempered by the fact that once its employees were allowed into the courtroom to video tape the proceedings, they could well assume no responsibility not to publish the video tape. Cognizant of the frequent conflict between freedom of the press and the right of privacy, we take this opportunity to encourage the use of compassionate discretion in situations such as this by quoting from Cantrell v. Forest City Publishing Co., 484 F.2d 150, 156-57 (6th Cir.1973), rev'd on other grounds, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974):
[D]espite vigorous efforts to avoid publicity, some people remain newsworthy because of circumstances which arouse a legitimate interest in their lives. In Sidis v. F-R Publishing Corporation, 113 F.2d 806 (2d Cir.1940), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1941), this was held to be true in the case of a child prodigy who had made every effort for 25 years to avoid publicity and for whom the results of later publicity were disastrous. The judgment of what is newsworthy must remain primarily a function of the publisher. However, in cases where essentially private persons are the subject of publicity because of their involuntary connection with events of widespread interest, this discretion or judgment of the publisher cannot be absolute. The curiosity and voracious appetite of the public for scandal would be too easily exploited by unscrupulous publishers. The right of the public to know is clearly one of the primary values protected by the First Amendment and its "... guarantees are not for the benefit of the press so much as for the benefit of all of us." Time, Inc. v. Hill, supra, 385 U.S. 374 at 389, 87 S.Ct. [534] at 543 [17 L.Ed.2d 456]. No test has been authoritatively formulated (see Bloustein, Privacy, Tort Law and the Constitution, 46 Texas L.Rev. 611, 626 for a thoughtful suggestion) for judicial review of "newsworthiness" in these cases. Only in cases of flagrant breach of privacy which has not been waived or obvious exploitation of public curiosity where no legitimate public interest exists should a court substitute its judgment for that of the publisher. This is not such a case.
In Rosenbloom v. Metromedia [403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296], Justice Brennan writing for the Supreme Court stated the problem and the American answer to it as follows:
We are aware that the press has, on occasion, grossly abused the freedom it is given by the Constitution. All must deplore such excesses. In an ideal world, the responsibility of the press would match the freedom and public trust given it. But from the earliest days of our history, this free society, dependent as it is for its survival upon a vigorous free press, has tolerated some abuse. In 1799, James Madison made the point in quoting (and adopting) John Marshall's answer to Talleyrand's complaints about American newspapers, American State Papers, 2 Foreign Relations 196 (U.S.Cong. 1832):

*332 "`Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this liberty is often carried to excess; that it has sometimes degenerated into licentiousness, is seen and lamented, but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which correct without enslaving the press, they have never yet been devised in America.'" 6 Writings of James Madison, 1790-1802, p. 336 (G. Hunt ed. 1906) (emphasis in original). 403 U.S. at 51, 91 S.Ct. at 1823.
Because we are no nearer to solving this dilemma now than they were then and because we are prohibited by Cox Broadcasting from balancing the competing interests at stake here, "reliance must rest upon the judgment of those who decide what to publish or broadcast." 420 U.S. at 496, 95 S.Ct. at 1046, 43 L.Ed.2d at 350. Therefore, we believe that in the future it would behoove the media to engage in their own balancing test with an eye to avoiding harm such as may have occurred here.
AFFIRMED.
SCHEB, A.C.J., and RYDER, J., concur.
NOTES
[1] 794.03 Unlawful to publish or broadcast information identifying sexual offense victims.  No person shall print, publish, or broadcast, or cause to be printed, published, or broadcast, in any instrument of mass communication the name, address, or other identifying fact or information of the victim of any sexual offense within this chapter... .
[2] Fla. Const. art. I, § 23.