RANDI ROMAINE, EDWINA WISEMAN, RETTA ROMAINE WEL-
BY AND FRANK WELBY, PLAINTIFFS–APPELLANTS, v. JO-
SEPH KALLINGER, ELIZABETH B. KALLINGER, HIS WIFE,
AND PAUL J. GIBLIN, ESQ., DEFENDANTS, AND FLORA
RHETA SCHREIBER AND SIMON AND SCHUSTER PUBLISH-
ING, INC., A CORPORATION OF THE STATE OF NEW YORK,
DEFENDANTS–RESPONDENTS.

Argued October 13, 1987—Decided February 18, 1988.

*Bruce L. Atkins* argued the cause for appellants (*Contant, Contant, Schuber, Scherby & Atkins,* attorneys; *Andrew T. Fede,* on the brief).

*Morrill J. Cole* argued the cause for respondent Flora Rheta Schreiber (*Cole, Schotz, Bernstein, Meisel & Forman,* attorneys; *Morrill J. Cole* and *Sidney J. Bernstein,* on the brief).

*Lee Alan Adlerstein* argued the cause for respondent Simon and Schuster Publishing, Inc., etc. (*Sills, Beck, Cummis Zuckerman, Radin, Tischman & Epstein,* attorneys; *L. Dew Kaneshiro,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

More than ten years ago Joseph Kallinger and his son went on a criminal rampage in Pennsylvania and New Jersey. The offenses were vicious, involving physical threats and sexual abuse of victims during the course of robberies of suburban homes. Kallinger murdered his victims on three occasions. In 1983, approximately eight years after Kallinger and his son had

been apprehended, the defendant Simon & Schuster Publishing Inc. published a book entitled "The Shoemaker," written by the defendant Flora Rheta Schreiber, depicting the life and crimes of Joseph Kallinger. The book gave rise to this litigation.

The plaintiffs, Randi Romaine, Edwina Wiseman, Retta Romaine Welby, and Frank Welby, were victims of Kallinger, whose criminal acts against them resulted in the murder of a young woman, Maria Fasching. Plaintiffs sued the defendants Kallinger, Elizabeth Kallinger, his wife, Schreiber, Simon & Schuster, and Paul J. Giblin, claiming to have been legally injured by defamatory and offensively intrusive statements relating to these crimes contained in "The Shoemaker." Plaintiffs sought in separate counts the award of compensatory and punitive damages based respectively on libel and invasion of privacy by being cast in a false light; they also claimed that their privacy had been invaded through the unreasonable publication of private facts. Other counts of the complaint sought damages based on unjust enrichment and the "Son of Sam" provisions of the Criminal Injuries Compensation Act of 1971, *N.J.S.A.* 52:4B–26 to –33.

Defendants Simon & Schuster and Schreiber filed motions for summary judgment seeking dismissal of the action. Plaintiffs filed cross-motions including one seeking partial summary judgment in favor of plaintiff Randi Romaine with respect to the defamation claim. The trial court granted defendants' motion for summary judgment with respect to the defamation and privacy claims. It also granted defendants summary judgment with respect to the unjust enrichment claims and with respect to claims based on the Criminal Injuries Compensation Act. The court also denied plaintiffs' cross-motion for summary judgment.

Plaintiffs filed a notice of appeal. In an unpublished opinion, the Appellate Division affirmed the dismissal of the defamation and privacy claims substantially for the reasons expressed in the

comprehensive opinion of Judge Cassidy, the trial judge. Plaintiffs then filed a petition for certification, which was granted by this Court. —— *N.J.* —— (1987).

## I.

The factual context of this litigation is important. Ms. Schreiber, the author of *"The Shoemaker,"* is a professor at the City University of New York, John Jay College of Criminal Justice. Although she has no formal training as a psychologist, Ms. Schreiber has written extensively about psychological subjects, and has focused on the problem of child abuse in her work. She is the author of *Sybil,* a study of a woman who suffered from a multiple-personality disorder.

According to defendants, Professor Schreiber's work is an in-depth study of the psychological make-up of a killer. Specifically, the book explores the relationship between the abuse suffered by Kallinger as a child and the psychotic behavior that led to his criminal acts. *"The Shoemaker"* received a significant amount of critical praise and Schreiber was named "Author of the Year" by the American Society of Journalists and Authors in 1985 in recognition of her work.

The complaint focuses on a chapter of *"The Shoemaker"* called "The Hunting Knife." The chapter, which consists of twenty-one pages out of a total of 423, describes the murder of Maria Fasching on January 8, 1975, in Leonia, New Jersey. The chapter relates that Kallinger and his son broke into the home of Mr. and Mrs. DeWitt Romaine. Eight people, who were in the home, were held hostage by Kallinger and his son. Kallinger ordered several of them to remove their clothes, and tied them up. He committed acts of personal abuse and physical degradation on two of the women. While this was occurring, Maria Fasching, a friend of one of the victims, the plaintiff Randi Romaine, came into the house. She was also captured by Kallinger. He directed Ms. Fasching, a nurse, to

perform an act of sexual mutilation on plaintiff Frank Welby, who was tied up and helpless. When she refused to do so, he killed her by slashing her throat several times. About one-half of the chapter is devoted to Kallinger's own recollections of the murder, obtained by Schreiber during interviews with him; these recollections are presented to indicate the extent that Kallinger's acts were the product of his mental illness. The balance of the chapter consists of the re-creation of the murder, as derived from testimony offered at Kallinger's trial by the survivors of the incident.

On the second page of "The Hunting Knife" chapter this passage appears relating the circumstances leading up to Maria Fasching's visit to the Romaine house:

> 2:45 p.m. A black Volkswagen parked in front of the tan stucco house. A slender woman, whose name was Maria Fasching, turned off the ignition, put the key into the pocket of her imitation fur coat, and stepped gracefully out of her car. She was five feet two inches tall, had brown shoulder-length hair, brown eyes, and a round face with full lips. She was engaged to be married, and, already a licensed practical nurse, she looked forward to becoming an RN.
>
> A militant women's libber, Maria Fasching was famous among her friends for her battles on behalf of the weak and downtrodden. She would always try to rescue someone a bully had attacked, and she could not tolerate racists.
>
> Maria thought of herself as a "free spirit." She resisted anything that she considered a restriction on her freedom. She cared for cats that had been hit by cars and for birds with broken wings.
>
> Today, Maria Fasching was on the four-to-midnight shift at Hackensack Hospital, and she wore her nurse's uniform under her coat. In the morning Maria's friend Randi Romaine, who lived in the stucco house, had called Maria and asked her to drop over for coffee. The two women had not seen each other for a long time, for, between hospital duties and preparations for her wedding, Maria's schedule was full.
>
> At first Maria said that she couldn't visit because she had to go to a wake. The wake, however, was only for an acquaintance. Randi and her twin sister, Retta, had been Maria's friends since they were all in the first grade. Besides, Maria was eager for news from Randi about a junkie they both knew who was doing time in prison. Finally, Maria changed her mind. She didn't go to the wake, but drove her Volkswagen to the two-story tan stucco house at 124 Glenwood Avenue, the house of Mr. and Mrs. Dewitt Romaine.

According to plaintiffs, one sentence in the passage falsely depicts the reason for Ms. Fasching's visit: "Besides, Maria was eager for news from Randi about a junkie they both knew

who was doing time in prison." This sentence, it is claimed, is defamatory as a matter of law and constitutes a false-light invasion of privacy.[1] The chapter's general narration of the criminal events, from which this passage is taken, is in turn the basis for plaintiffs' invasion of privacy by unreasonable publication of private facts claim.

## II.

Plaintiff Randi Romaine asserts that the particular sentence is defamatory as a matter of law, or alternatively, that the statement's defamatory content was at least a question for the jury. She claims this sentence falsely accuses her of criminality or associations with criminals. Plaintiff also contends that the false accusation was particularly damaging because it injured Ms. Romaine's professional reputation as a drug counsellor and a social worker, interfering with her ability to obtain future employment.

A defamatory statement is one that is false and "injurious to the reputation of another" or exposes another person to "hatred, contempt or ridicule" or subjects another person to "a loss of the good will and confidence" in which he or she is held by others. *Leers v. Green*, 24 *N.J.* 239, 251 (1957); *see* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts*, ¶ 111 at 773–78 (5th ed. 1984); *see also Restatement (Second) of Torts* § 559 (1977) (a defamatory communication is one that "tends so to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.")

---

[1]The trial court dismissed the defamation claims of plaintiffs Edwin Wiseman, Retta Romaine Welby, and Frank Welby, finding that the statement did not concern these individuals. Plaintiffs Wiseman, Welby, and Welby conceded before the Appellate Division that this ruling was correct, hence the only remaining defamation claim is that of Randi Romaine. All plaintiffs, however, continue to press the false-light invasion of privacy claim caused by this same statement.

■ The threshold issue in any defamation case is whether the statement at issue is reasonably susceptible of a defamatory meaning. *Kotlikoff v. The Community News*, 89 *N.J.* 62, 67 (1982); *Mosler v. Whelan*, 28 *N.J.* 397, 404 (1958). This question is one to be decided first by the court. *See Lawrence v. Bauer Publishing & Printing Ltd.*, 89 *N.J.* 451, 459, *cert.* denied, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982); *Leers v. Green, supra,* 24 *N.J.* at 253; *Karnell v. Campbell,* 206 *N.J.Super.* 81, 88 (App.Div.1985). In making this determination, the court must evaluate the language in question "according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Herrmann v. Newark Morning Ledger Co.,* 48 *N.J.Super.* 420, 431 (App. Div.), aff'd on rehearing, 49 *N.J.Super.* 551 (App.Div.1958); *see Molnar v. The Star-Ledger,* 193 *N.J.Super.* 12, 18 (App.Div. 1984); *Dressler v. Mayer,* 22 *N.J.Super.* 129, 135 (App.Div. 1952). In assessing the language, the court must view the publication as a whole and consider particularly the context in which the statement appears. *See Karnell v. Campbell, supra,* 206 *N.J.Super.* at 88; *Molnar v. The Star–Ledger, supra,* 193 *N.J.Super.* at 18; *Dressler v. Mayer, supra,* 22 *N.J.Super.* at 135; *see also Cibenko v. Worth Publishers, Inc.,* 510 *F.Supp.* 761, 764 (D.N.J.1981) (applying New Jersey law).

■■ If a published statement is susceptible of one meaning only, and that meaning is defamatory, the statement is libelous as a matter of law. *See Mosler v. Whelan, supra,* 28 *N.J.* at 405; *Herrmann v. Newark Morning Ledger Co., supra,* 48 *N.J.Super.* at 430. Conversely, if the statement is susceptible of only a non-defamatory meaning, it cannot be considered libelous, justifying dismissal of the action. *See Pierce v. Capital Cities Communications Inc.,* 576 *F.*2d 495, 501–04 (3d Cir.) (applying Pennsylvania law), *cert.* denied, 439 *U.S.* 861, 99 *S.Ct.* 181, 58 *L.Ed.*2d 170 (1978); *Cibenko v. Worth Publishers, supra,* 510 *F.Supp.* at 764–65. However, in cases where the statement is capable of being assigned more than one meaning, one of which is defamatory and another not, the question of

whether its content is defamatory is one that must be resolved by the trier of fact. *See Lawrence v. Bauer Publishing & Printing Ltd., supra,* 89 *N.J.* at 459; *Mosler v. Whelan, supra,* 28 *N.J.* at 404–05; *Karnell v. Campbell, supra,* 206 *N.J.Super.* at 88; *Herrmann v. Newark Morning Ledger Co., supra,* 48 *N.J.Super.* at 430.

■ Certain kinds of statements denote such defamatory meaning that they are considered defamatory as a matter of law. A prime example is the false attribution of criminality. *See Hoagburg v. Harrah's Marina Hotel Casino,* 585 *F.Supp.* 1167, 1170 (D.N.J.1984); *Karnell v. Campbell, supra,* 206 *N.J.Super.* at 88–89; *cf. Lawrence v. Bauer Publishing & Printing Ltd., supra,* 89 *N.J.* at 459–60 (statement that plaintiff might be charged with criminal conduct defamatory as a matter of law). Relying essentially on this example of defamation, plaintiff Randi Romaine contends in this case that the published offending statement must be considered libelous *per se.* According to Ms. Romaine, the sentence has only a defamatory meaning, in that it accuses her of having engaged in criminal conduct or having associated with criminals relating to drugs.

■ The trial court concluded, and the Appellate Division agreed, that only the most contorted reading of the offending language could lead to the conclusion that it accuses plaintiff of illegal drug use or criminal associations. We concur in the determinations of the courts below. "[A]ccording to the fair and natural meaning which will be given [this statement] by reasonable persons of ordinary intelligence," *Herrmann v. Newark Morning Ledger Co., supra,* 48 *N.J.Super.* at 431, it does not attribute any kind of criminality to plaintiff. A reasonable and fair understanding of the statement simply does not yield an interpretation that the plaintiff was or had been in illegal possession of drugs or otherwise engaging in any illegal drug-related activity. *See Valentine v. C.B.S., Inc.,* 698 *F.*2d 430, 432 (11th Cir.1983) ("The plaintiff's interpretation does not

construe the words as the common mind would understand them but is tortured and extreme."); *Forsher v. Bugliosi,* 26 *Cal.*3d 792, 805, 608 *P.*2d 716, 723, 163 *Cal.Rptr.* 628, 635 (1980) ("the claimed defamatory nature of the book as it relates to appellant is so obscure and attenuated as to be beyond the realm of reasonableness").

At most, the sentence can be read to imply that plaintiff knew a junkie. Even if we assume that a commonly accepted and well-understood meaning of the term "junkie" is "a narcotics peddler or addict," *Webster's Third New International Dictionary* 1227 (1981), *see also Dictionary of American Slang* 300 (2d ed. 1975) (defining "junkie" as a "drug addict"), the statement still does not suggest either direct or indirect involvement by plaintiff herself in any criminal drug-related activities. Absent exceptional circumstances, the mere allegation that plaintiff knows a criminal is not defamatory as a matter of law. *See. e.a.. Gonzales v. Times Herald Printing Co.,* 513 *S.W.*2d 124 (Tex.Civ.App.1974) (statement that plaintiff's husband was engaged in the sale and importation of narcotics did not defame her); *Rose v. Daily Mirror, Inc.,* 284 *N.Y.* 335, 31 *N.E.*2d 182 (1940) reh'g denied, 285 *N.Y.* 616, 33 *N.E.*2d 548 (1941) (plaintiff not defamed by being mistakenly described as the widow of a mobster); *cf. Bufalino v. Associated Press,* 692 *F.*2d 266 (2d Cir.1982) (mere imputation of family relationship with Mafia leader not defamatory; characterization of plaintiff as a political contributor with alleged mob ties found to have a potentially defamatory meaning), *cert.* denied, 462 *U.S.* 1111, 103 *S.Ct.* 2463, 77 *L.Ed.*2d 1340 (1983).

Beyond the language itself, we are satisfied that the statement in its contextual setting cannot fairly and reasonably be invested with any defamatory meaning. Maria Fasching, we note, is described in the chapter as a person who had compassion for others and who would care for less fortunate persons. The reasonable meaning of the critical sentence that is implied from this context is that Ms. Fasching's interest in the "junkie" stemmed from sympathy and compassion, not from any predilic-

tion toward or involvement in criminal drug activity. As extended to Randi Romaine, the only fair inference to be drawn from the larger context is that Ms. Romaine shared her friend's feelings, attitudes and interests, and that her own interest in the junkie was similar to that of Ms. Fasching's.

We note the further contention that this statement had a defamatory meaning because it implied that the only reason for Ms. Fasching's visit to the Romaine home was her "interest" in news about a "junkie." A review of the full text, however, indicates that there were several reasons for the visit, only one of which was Ms. Fasching's interest in the "junkie." The lower courts soundly rejected this contention.

We conclude that the statement is not defamatory as a matter of law and accordingly uphold the ruling of the lower court on this point.

### III.

Plaintiffs claim that the publication of the statement invaded their privacy by placing them in a false light. They allege that because it implies criminal conduct or associations with drug users on their part, the statement thus casts them in a false light that is highly offensive to a reasonable person. The trial court's dismissal of this count of the complaint was upheld by the Appellate Division.

It is accepted in New Jersey that a cause of action exists for invasions of privacy involving "publicity that unreasonably places the other in a false light before the public." *See, e.g., Machleder v. Diaz,* 801 *F.*2d 46, 53 (2d Cir.1986), *cert.* denied, *Machleder v. CBS, Inc.,* —— U.S. ——, 107 *S.Ct.* 1294, 94 *L.Ed.*2d 150 (1987) (applying New Jersey law); *Cibenko v. Worth Publishers, Inc., supra,* 510 *F.Supp.* at 766; *Faber v. Condecor, Inc.,* 195 *N.J.Super.* 81, 86–87 (App.Div.), certif. denied, 99 *N.J.* 178 (1984); *Bisbee v. John C. Conover Agency,* 186 *N.J.Super.* 335, 339 (App.Div.1982); *N.O.C., Inc. v. Schaefer,* 197 *N.J.Super.* 249, 253–54 (Law Div.1984); *Devlin v.*

*Greiner,* 147 *N.J.Super.* 446, 461–62 (Law Div.1977); *Palmer v. Schonhorn Enterprises, Inc.,* 96 *N.J.Super.* 72, 75 (Ch.Div. 1967). Liability for this form of privacy invasion is found when

[o]ne ... gives publicity to a matter concerning another that places the other before the public in a false light [and]

. . . . . . .

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. [*Restatement (Second) of Torts* § 652E.]

■ There are differing interests protected by the law of defamation and the law of privacy, which account for the substantive gradations between these torts. The interest protected by the duty not to place another in a false light is that of the individual's peace of mind, *i.e.,* his or her interest "in not being made to appear before the public in an objectionable false light or false position, or in other words, otherwise than as he is." *Restatement (Second) of Torts* § 652E, comment b; *see* Comment, "False Light: Invasion of Privacy?", 15 *Tulsa L.J.* 115, 117 (1979). "The action for defamation," on the other hand, "is to protect a person's interest in a good reputation...." *Prosser and Keeton on the Law of Torts, supra* § 117, at 864. Nevertheless, despite analytical distinctions, there is a conceptual affinity between the causes of action based on these two theories. *See Cibenko v. Worth Publishers, Inc., supra,* 510 *F.Supp.* at 766; *Bisbee v. John C. Conover Agency, supra,* 186 *N.J.Super.* at 342. As with the requirement in defamation actions that the matter publicized be untrue, a fundamental requirement of the false light tort is that the disputed publicity be in fact false, or else "at least have the capacity to give rise to a false public impression as to the plaintiff." Annotation, "False Light Invasion of Privacy–Cognizability and Elements," 57 *A.L.R.* 4th 22, 104 (1987); *see Tellado v. Time–Life Books, Inc.,* 643 *F.Supp.* 904, 907 (D.N.J. 1986); *Cibenko v. Worth Publishers, Inc., supra,* 510 *F.Supp.* at 766; *Bisbee v. John C. Conover Agency, supra,* 186 *N.J.Su-*

*per.* at 342; *Restatement (Second) of Torts,* § 652E, comment b. However, unlike a defamation claim, it is not necessary in false-light actions that the material that casts plaintiff in a false light also injure her standing in the community. *See Cibenko v. Worth Publishers, Inc., supra,* 510 *F.Supp.* at 766; *Restatement (Second) of Torts* § 652E, comment b.

The publicized material in a false-light claim must constitute a "major misrepresentation of [plaintiff's] character, history, activities or beliefs." *Jonap v. Silver,* 1 *Conn.App.* 550, 559, 474 *A.*2d 800, 806 (1984). Thus, there can be no recovery for false-light invasion of privacy unless it is shown that the publicity at issue was of a character "highly offensive to a reasonable person." *Restatement (Second) of Torts* § 652E; *see Machleder v. Diaz, supra,* 801 *F.*2d at 53; *Bisbee v. John C. Conover Agency, supra,* 186 *N.J.Super.* at 342. This protection of privacy does not extend to the "hypersensitive person;" the material publicized "must be something that would be objectionable to the ordinary person under the circumstances." *Prosser and Keeton on the Law of Torts, supra,* § 117, at 864.

■ As with defamation claims, it is for the court first to determine whether the criticized matter is capable of the meaning assigned to it by plaintiff, and whether that meaning is highly offensive to a reasonable person. *See Cibenko v. Worth Publishers, Inc., supra,* 510 *F.Supp.* at 766; *cf. McCabe v. Village Voice, Inc.,* 550 *F.Supp.* 525, 529 (E.D.Pa.1982) (dismissing false-light privacy claim on the ground that the material was not susceptible of a meaning highly offensive to a reasonable person). In making this determination, the court "should not consider words or elements in isolation, but should view them in the context of the whole article to determine if they constitute an invasion of privacy." *Rinsley v. Brandt,* 700 *F.*2d 1304, 1310 (10th Cir.1983) (applying Kansas law).

■ We concur in this case with the trial court's analysis of the criticized statement and the court's determination that it could not reasonably be construed to constitute an accusation of

illegal drug use; nor, as we have pointed out, is it reasonably susceptible of an interpretation denoting that any of the plaintiffs associated with illegal drug users or traffickers. Because the sentence does not carry the meaning ascribed to it by plaintiffs, it cannot be found to be highly offensive to a reasonable person, and it could not have cast plaintiffs in a false light. *See Cibenko v. Worth Publishers, Inc., supra,* 510 *F.Supp.* at 766–67; *Fogel v. Forbes, Inc.,* 500 *F.Supp.* 1081, 1088 (E.D.Pa. 1980) (applying Pennsylvania law).

Furthermore, the subject matter of the criticized sentence constitutes only a minor or insubstantial portion of the overall text. For this additional reason, any inaccuracies or false statements contained in that material cannot fairly be regarded as highly offensive to a reasonable person as a matter of law. *See, e.g. University of Notre Dame Du Lac v. Twentieth Century–Fox Film Corp.,* 22 *A.D.*2d 452, 256 *N.Y.S.*2d 301, aff'd 15 *N.Y.*2d 940, 259 *N.Y.S.*2d 832, 207 *N.E.*2d 508 (1965) (satirical references to plaintiff as president of university were not actionable since they were of a "fleeting and incidental nature."); *see also Koussevitzky v. Allen, Towne & Heath, Inc.,* 188 *Misc.* 479, 485, 68 *N.Y.S.*2d 779, 784 (Sup.Ct.), aff'd, 272 *A.D.* 759, 69 *N.Y.S.*2d 432, appeal denied, 272 *A.D.* 794, 71 *N.Y.S.*2d 712 (1947) (fictionalized or exaggerated references in biography of prominent conductor not actionable because they were only a minor part of the entire text and therefore not "repugnant to one's sense of decency."); *Carlisle v. Fawcett Publications, Inc.,* 201 *Cal.App.*2d 733, 748, 20 *Cal.Rptr.* 405, 415 (1962) (certain minor inaccuracies and fictionalizations in an account of plaintiff's marriage to the actress Janet Leigh did not constitute an invasion of privacy).

Not even the most strained reading of the sentence reveals a meaning that in any way concerns the plaintiffs other than Randi Romaine or places them in a false or meretricious light. To the extent that these plaintiffs may be viewed as asserting a "relational right of privacy," no plausible basis for such a cause of action can be gleaned from the record. *See Fasching v.*

*Kallinger,* 211 *N.J.Super.* 26, 39–41 (App.Div.1986); *Weller v. Home News Publishing Co.,* 112 *N.J.Super.* 502, 507 (Law Div.1970); *see also Young v. That was the Week That Was,* 312 *F.Supp.* 1337, 1341 (N.D.Ohio 1969), aff'd, 423 *F.*2d 265 (6th Cir.1970) (same result under Ohio law); *Cordell v. Detective Publications, Inc.,* 307 *F.Supp.* 1212, 1218–19 (E.D.Tenn.1968), aff'd, 419 *F.*2d 989 (6th Cir.1969) (Tennessee law); *Restatement (Second) of Torts* § 652I, comment a ("The right protected by the action for invasion of privacy is a personal right, ... and it cannot be maintained by other persons such as members of the individual's family.")

Accordingly, we conclude that the lower courts properly determined that plaintiffs had failed as a matter of law to demonstrate that the particular passage tortiously invaded their protectable privacy interests by placing them in a false light.

## IV.

Plaintiffs contend that the chapter "The Hunting Knife" publicizes matters pertaining to their private lives in a manner offensive to a reasonable person. They thus claim a cause of action based upon the invasion of privacy by the unreasonable publication of private facts. In making this claim, plaintiffs concede that the chapter is an accurate and truthful depiction of the events that occurred on January 8, 1975. However, they contend that their criminal victimization, personal degradation, and physical abuse at the hands of Kallinger occurred in private, and that disclosure of the details of these crimes eight years after their occurrence is highly offensive.

The invasion of privacy by unreasonable publication of private facts occurs when it is shown that "the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized." *Bisbee v. John C. Conover Agency, supra,* 186 *N.J.Super.* at 340; *see Restatement (Second) of Torts* § 652D.

 It is important to stress that this privacy tort permits recovery for *truthful* disclosures. For this reason the recognition of such a tort creates significant potential for conflict with the guarantees contained in the first amendment of the Constitution. *Cox Broadcasting Corp. v. Cohn*, 420 *U.S.* 469, 489, 95 *S.Ct.* 1029, 1043, 43 *L.Ed.*2d 328, 346 (1975); *see Forsher v. Bugliosi, supra*, 26 *Cal.*3d at 809, 608 *P.*2d at 725, 163 *Cal. Rptr.* at 637 (citing Warren & Brandeis, "The Right to Privacy," 4 *Harv.L.Rev.* 193, 214 (1890)); *Restatement (Second) of Torts* § 652D, Special Note. This constitutional dimension explains the stringency of the requirements that must be met in order successfully to establish this privacy-invasion cause of action.

 The critical chapter describes the painful treatment, the humiliation, and abuse that the plaintiffs suffered at the hands of Kallinger. Such publicity is likely traumatic and profoundly disturbing for plaintiffs and would be highly offensive to a reasonable person because it exposes to the public eye the suffering and degradation that they were forced to endure. However, plaintiffs' appeal fails because the facts revealed are not private, and even if they were private, they are of legitimate concern to the public and so privileged under the "newsworthiness" exception to the "unreasonable publication of private facts" claim.

The determination as to whether published facts are actually private constitutes the first key element of this cause of action. If the facts are public information, even though they relate to matters of individual privacy, they cannot for these purposes be considered "private." The court must first determine then whether the published facts were in the public domain, and hence not private facts.

Public records that recount or disclose particular facts may serve to place such facts in the public arena and thus bar a claim for publication of private facts. While the term "public records" is not self-defining, we need not in this case determine

the extent to which particular official governmental records place facts in the public domain. Here, the facts complained of were contained in non-confidential official court records of the Kallinger trial.

In *Cox Broadcasting Corp. v. Cohn, supra,* the Supreme Court addressed the question of whether a television station could be held liable to the family of a deceased rape victim for the publication of her name. The victim's name was obtained from a copy of the indictment of her suspected assailant; the document was a part of the public record of the trial. *Id.,* 420 *U.S.* at 472–73, 95 *S.Ct.* at 1035, 43 *L.Ed.*2d at 336. Observing that "the interests of privacy fade when the information already appears on the public record," the Supreme Court held that "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Id.* at 494–95, 95 *S.Ct.* at 1046, 43 *L.Ed.*2d at 349–50.

In *Cox Broadcasting,* the Supreme Court refused to engage in an inquiry into whether the publication was offensive to the sensibilities of the reasonable person: "Such a rule ... would invite timidity and self-censorship and very likely lead to the suppression of many items that would otherwise be published and that should be made available to the public." *Id.* at 496, 95 *S.Ct.* at 1046–47, 43 *L.Ed.*2d at 350. Many cases similarly recognize facts contained in a public court record can be published without liability, even when the information may be embarassing or normally considered "private", because the court record places the facts in the public arena. *See, e.g., Dresbach v. Doubleday,* 518 *F.Supp.* 1285, 1290 (D.D.C.1981) ("republication of matters which are in the public record of the trial and related proceedings, no matter how private or offensive, as information contained in the public record is absolutely privileged."); *Doe v. Sarasota–Bradenton Television,* 436 *So.* 2d 328, 329–30 (Fla.Dist.Ct.App.1983) (no liability for broadcast of the name of rape victim who testified at trial); *Poteet v.*

*Roswell Daily Record*, 92 *N.M.* 170, 172, 584 *P.*2d 1310, 1312 (Ct.App.1978) (same); *Montesano v. Donrey Media Group*, 99 *Nev.* 644, 650–51, 668 *P.*2d 1081, 1085–86 (1983), *cert.* den., 466 *U.S.* 959, 104 *S.Ct.* 2172, 80 *L.Ed.*2d 555 (1984) (no liability for reporting plaintiff's 23–year–old hit-and-run conviction).

This authority demonstrates that the trial court's grant of summary judgment in favor of defendants on the count charging unreasonable publication of private facts was proper. The circumstances of this case fall squarely within the freedom to publish information contained in public court records sanctioned by *Cox Broadcasting*. The details and facts that plaintiffs claim invaded their privacy were made public by the testimony in court by plaintiffs and other witnesses. They were part of the court record in Kallinger's trial and were extensively reported on at the time of the trial.

Plaintiffs also contend that recovery should not be barred in this case because eight years passed between the crimes depicted in *"The Shoemaker"* and the publication of the book. This argument is unpersuasive. The *Cox Broadcasting* opinion does not suggest that the absolute privilege to publish matters contained in public records is limited if the events are not contemporaneous or recent. Moreover, courts after *Cox Broadcasting* have found a privilege to disseminate matters contained in public court records despite the passage of a significant period of time. *See, e.g., Dresbach v. Doubleday, supra,* 518 *F.Supp.* at 1290 (nineteen years); *Montesano v. Donrey Media Group, supra,* 99 *Nev.* at 650–51, 668 *P.*2d at 1085–86 (23 years).

This claim is related to the additional argument made by defendants that the information that was published in "The Shoemaker" was newsworthy and therefore its publication was privileged. If facts cannot otherwise be considered "private," then a determination of their "newsworthiness" is obviated. *Restatement (Second) of Torts* § 652D, Comment b. However, if the critical facts are private, publication of those facts would

not constitute an actionable invasion of privacy if they are "newsworthy" and thus a matter of legitimate public concern.

█ The "newsworthiness" defense in privacy-invasion tort actions is available to bar recovery where the subject matter of the publication is one in which the public has a legitimate interest. *See Campbell v. Seabury Press*, 614 *F.*2d 395, 397 (5th Cir.1980); *Meeropol v. Nizer*, 381 *F.Supp.* 29, 37 (S.D.N.Y. 1974), aff'd, 560 *F.*2d 1061 (2nd Cir.1975), *cert.* den. 434 *U.S.* 1013, 98 *S.Ct.* 727, 54 *L.Ed.*2d 756 (1978); *Barbieri v. News–Journal Co.*, 189 *A.*2d 773, 775 (Del.1963).[2] A publication is commonly understood to be "newsworthy" when it contains an " 'indefinable quality of information' that arouses the public's interest and attention." *Prosser and Keeton on the Law of Torts, supra*, § 117 at 860 (quoting *Sweenek v. Pathe News*, 16 *F.Supp.* 746, 747 (E.D.N.Y.1936) (footnote omitted)). In such cases it is for the court to determine whether a matter is of legitimate public interest. *See Rosanova v. Playboy Enterprises, Inc.*, 411 *F.Supp.* 440, 444 (S.D.Ga.1976), aff'd 580 *F.*2d 859 (5th Cir.1978); *Hotchner v. Castillo–Puche*, 404 *F.Supp.* 1041, 1045 (S.D.N.Y.1975); *Coleman v. Newark Morning Ledger Co.*, 29 *N.J.* 357, 376 (1959); *cf. Lawrence v. Bauer Publishing & Printing Ltd.*, 89 *N.J.* at 462 (in defamation actions, existence of a privilege is a question of law for the court).

█ In addition, once a matter is found to be within the sphere of public interest, otherwise private facts that are related to the subject may also be considered "newsworthy," and therefore publishable. *See Dresbach v. Doubleday, supra*, 518 *F.Supp.* at 1290; *Restatement (Second) of Torts* § 652D, com-

[2]We have acknowledged in the variant context of fair comment involving an alleged untruthful statement that "not everything that is newsworthy is a matter of legitimate public concern and sorting such matters from those of a more private nature may be difficult." *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 *N.J.* 125, 144 (1986). The concept of newsworthiness may be somewhat broader than that which is encompassed by the notion of "legitimate public concern." We need not in this case dwell on such possible differences.

ments f, h. Further, the newsworthiness defense in this context often encompasses information pertaining to individuals who have not actively or consciously sought, or who have scrupulously avoided, publicity. *See Campbell v. Seabury Press, supra,* 614 *F.*2d at 397; *Elmhurst v. Pearson,* 153 *F.*2d 467, 468 (D.C.Cir.1946); *Sidis v. F-R Publishing Corp.,* 113 *F.*2d 806, 809 (2nd Cir.1940), *cert.* den., 311 *U.S.* 711, 61 *S.Ct.* 393, 85 *L.Ed.* 462 (1940); *Restatement (Second) of Torts* § 652D, comment f; *cf. Sisler v. Gannett,* 104 *N.J.* 256, 279 (1986) (in a defamation action, a private person may enter into a personal transaction or conduct his personal affairs in a manner that "implicates a legitimate public interest with an attendant risk of publicity"). However, there must be an appropriate nexus between the plaintiff and the matter that is newsworthy or of legitimate public interest. *See Campbell v. Seabury Press, supra,* 614 *F.*2d at 397; *Dresbach v. Doubleday, supra,* 518 *F.Supp.* at 1290; *Prosser and Keeton on the Law of Torts, supra,* § 117, at 862.

 The events that occurred in the Romaine home on January 8, 1975, were newsworthy and matters of legitimate public concern. These events were the subject of widespread and intense publicity when they occurred. Extensive contemporaneous publicity of this sort is a strong indication that the subject is one that is clearly newsworthy. *See Valentine v. C.B.S., Inc., supra,* 698 *F.*2d at 433; *Cordell v. Detective Publications, Inc., supra,* 307 *F.Supp.* at 1218; *Rawlins v. Hutchinson Publishing Co.,* 218 *Kan.* 295, 296–97, 543 *P.*2d 988, 990 (1975). Moreover, the facts surrounding the commission of a crime are subjects of legitimate public concern. *See Cox Broadcasting Corp. v. Cohn, supra,* 420 *U.S.* at 492, 95 *S.Ct.* at 1045, 43 *L.Ed.*2d at 348; *accord Valentine v. C.B.S., Inc., supra,* 698 *F.*2d at 433 ("events surrounding [Rubin (Hurricane) ] Carter's trial and recent retrial continue to be matters of legitimate public interest"); *Restatement (Second) of Torts* § 652D, comment g. This concern extends to victims and other individuals who unwillingly become involved in the commission

of a crime or its prosecution. *See Elmhurst v. Pearson, supra,* 153 *F.*2d at 468; *see also Restatement (Second) of Torts* § 652D, comment f ("those who are the victims of crime or are so unfortunate as to be present when it is committed ... are regarded as properly subject to the public interest").

The contention of plaintiffs that the publicized matter is stale or remote may suggest that the publicized information was not "newsworthy" or a matter of legitimate public concern, and therefore recovery ought not be barred. The news value and public interest in criminal events are not abated by the passage of time. *See Dresbach v. Doubleday, supra,* 518 *F.Supp.* at 1290. Most courts that have addressed the effect of the passage of time on the public interest have concluded that a lapse of time does not dilute newsworthiness or lessen the legitimacy of the public's concern. *See, e.g., Valentine v. C.B.S., Inc.,* 698 *F.*2d at 433; *Dresbach v. Doubleday, supra,* 518 *F.Supp.* at 1290 *Montesano v. Donrey Media Group, supra,* 668 *P.*2d at 1083; *see also Rawlins v. Hutchinson Publishing Co., supra,* 218 *Kan.* at 305, 543 *P.*2d at 996 (column entitled "Looking Backward," which described plaintiff's ten-year-old suspension from the local police force for conduct unbecoming an officer, "is newsworthy when it occurs, and remains so for as long as anyone thinks it worth retelling").

We are not persuaded to a different conclusion by *Briscoe v. Reader's Digest Ass'n,* 4 *Cal.*3d 529, 483 *P.*2d 34, 93 *Cal.Rptr.* 866 (1971). There, it was held that the publication of a convicted felon's name eleven years after his conviction could be the basis of a claim for invasion of privacy, because his identity was no longer newsworthy. *Id.* at 541, 483 *P.*2d at 43, 93 *Cal.Rptr.* at 875. Applying a three-part test for determining newsworthiness first set out in *Kapellas v. Kofman,* 1 *Cal.*3d 20, 36, 459 *P.*2d 912, 922, 81 *Cal.Rptr.* 360, 370 (1969), the court concluded that the disclosure of plaintiff's name had minimal social value, that it was grossly offensive to a reasonable

person, and that plaintiff had not consented to the publicity. *Id.* [3]

*Briscoe* does not dictate a different result in this case. In *Forsher v. Buguliosi, supra,* the California Supreme Court emphasized that *Briscoe* constituted an exception to the general rule that the passage of time does not dilute newsworthiness. Observing that the *Briscoe* holding was bottomed on "the fact that the state has a compelling interest in the rehabilitative process and that a continuing threat of media disclosure of the identity of past criminals is counterproductive to this process," the court limited *Briscoe* to cases involving the identity of rehabilitated convicts. *Forsher, supra,* 26 *Cal.*3d at 810, 608 *P.*2d at 726, 163 *Cal.Rptr.* at 638; *see also Dresbach v. Doubleday, supra,* 518 *F.Supp.* at 1289 ("*Briscoe* was 'an exception to the more general rule that once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days' ") (quoting *Forsher v. Bugliosi, supra,* 26 *Cal.*3d at 810, 608 *P.*2d at 726, 163 *Cal.Rptr.* at 638); *Johnson v. Harcourt, Brace, Jovanovich, Inc.,* 43 *Cal.App.*3d 880, 118 *Cal.Rptr.* 370, 378 (Ct.App.1974) (same). Moreover, the facts disclosed in *Briscoe* were matters of public court record, and we do not believe that *Briscoe* can endure as a viable precedent in light of the absolute privilege to report matters in public court records determined in *Cox Broadcasting* and endorsed by us today.

In sum, we conclude that the trial court properly dismissed plaintiffs' unreasonable publicity claim. The facts reported in "*The Shoemaker*" were in the public domain, newsworthy, and

---

[3] *See also Capra v. Thoroughbred Racing Ass'n,* 787 *F.*2d 463, 464–65 (9th Cir.), *cert.* denied, —— U.S. ——, 107 *S.Ct.* 669, 93 *L.Ed.*2d 721 (1986). In *Capra* the plaintiff was a participant in the federal witness protection program; publication of his true identity in connection with his wife's application for a horse-racing license was actionable because of the substantial State interest in witness protection. No such interest is involved in the instant case.

matters of legitimate public concern. Thus, their publication is entitled to protection.

## V.

For the reasons set forth in this opinion, we affirm the judgment below.

O'HERN, J., dissenting.

Although I agree with the principles of defamation law articulated by the majority, I write separately to note my disagreement with the application of these principles to the summary dismissal of plaintiff Romaine's complaint that she was libeled by defendants' reference to her as one awaiting news from a "junkie," thus inferentially stating that she was an associate of a criminal. My dissent, then, concerns not the law of libel, but plaintiff's right to a jury trial of contested issues of fact.

As noted by the majority, the book, "The Shoemaker," details the crimes of Joseph Kallinger, a convicted murderer. During one of his crime sprees, Kallinger held Randi Romaine and seven others hostage. When plaintiff's friend, Maria Fasching, arrived at the crime scene, she was seized and murdered by Kallinger. A chapter of the book, entitled "The Hunting Knife," describes the reason for Maria Fasching's visit to the Romaine house as follows: "[b]esides, Maria was eager for news from Randi about a junkie they both knew who was doing time in prison." Plaintiff contends that this sentence is defamatory as a matter of law because it falsely accuses her of criminality or of associating with criminals. Although I agree with the majority that this statement is not libelous *per se*, *Lawrence v. Bauer Publishing & Printing Ltd.*, 89 *N.J.* 451, 459, *cert. denied*, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982), I cannot conclude that the sentence is not reasonably susceptible of a defamatory meaning, *Kotlikoff v. The Community News*, 89 *N.J.* 62, 67 (1982).

A defamatory statement is one that is false and that either injures "the reputation of another," exposes another to "hatred, contempt or ridicule," or subjects another to "a loss of the good will and confidence entertained towards him by others...." *Leers v. Green*, 24 *N.J.* 239, 251 (1957). In determining whether allegedly defamatory words are actionable, "[t]he language in question must be construed according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Herrmann v. Newark Morning Ledger Co.*, 48 *N.J.Super.* 420, 431 (App.Div.), *aff'd on rehearing*, 49 *N.J.Super.* 551 (App.Div.1958). The allegedly defamatory statement must be taken in context and the publication considered as a whole. *See Kotlikoff v. The Community News, supra*, 89 *N.J.* at 72.

Moreover, "[t]o establish the defamatory nature of the article[ ] it [is] not necessary for plaintiffs to prove that defendants had accused them of the commission of a crime. Words that clearly 'sound to the disreputation' of an individual are defamatory on their face." *Lawrence v. Bauer Publishing & Printing Ltd., supra*, 89 *N.J.* at 459 (citation omitted). Thus, the fact that the statement at issue does not directly accuse Randi Romaine of being a criminal or of associating with criminals is of little consequence, for "[t]he sting of an accusation may be more pervasive when made by insinuation. Insinuations may thus be more 'mischievous' than direct assertions." *Lawrence v. Bauer Publishing & Printing Ltd.*, 176 *N.J.Super.* 378, 389 (App.Div.1980), *rev'd in part and vacated in part on other grounds*, 89 *N.J.* 451, *cert. denied*, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982) (citation omitted).

In libel actions, the preliminary question for the trial court is whether the words at issue are reasonably susceptible of a defamatory meaning. *Kotlikoff v. The Community News, supra*, 89 *N.J.* at 67 (citing *Herrmann v. Newark Morning Ledger Co., supra*, 48 *N.J.Super.* at 429–30). While it is settled that the determination of whether a statement is defamatory is a question of law to be resolved by the trial court, *Lawrence v.*

*Bauer Publishing & Printing Ltd., supra,* 89 *N.J.* at 459, it is equally clear that "where the words are ambiguous, reasonably capable of either an innocent or a defamatory meaning, it is a question of fact for the jury to determine * * * which of the two meanings * * * [was] understood by those to whom the publication was made." *Leers v. Green, supra,* 24 *N.J.* at 253; *see also Lawrence v. Bauer Publishing & Printing Ltd., supra,* 89 *N.J.* at 459 (two newspaper articles had been held to be libelous *per se* and hence not reasonably susceptible of nondefamatory interpretation).

When we view defamation issues under state common law, the standard for summary judgment is the traditional test of whether plaintiff has raised a genuine issue of material fact that requires a trial on the merits. *Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 *N.J.* 125, 156–57 (1986) (citing *Judson v. Peoples Bank & Trust Co.,* 17 *N.J.* 67, 73–75 (1954)). The dispositive question, then, as the majority frames it, is whether defendants' insinuation that Randi Romaine was an associate of a "junkie" was ambiguous or reasonably susceptible of either an innocent or a defamatory meaning. *Supra* at 290. I am satisfied that in the context of this case the defendants' characterization of Randi Romaine as an associate of a "junkie" was reasonably susceptible of a defamatory meaning. I must therefore dissent from the Court's disposition.

It may be that there is a quite innocent or rational explanation for the author's reference to Ms. Romaine's association with a "junkie." That reference may be a mere mistake and thus might be insulated from liability in the context of this work, which is intended to explore matters that are reasonably to be regarded as within the public interest. Because this case comes to us on a motion for summary judgment, however, we must assume the worst scenario for the offenders: that they deliberately misstated this element of the narrative. I suspect that such a scenario is far from reality, but because of the procedural posture of the case I must dissent from the holding that no jury could find that the reference to an innocent victim

of crime as an associate of a convicted "junkie" reduced her esteem in the community or placed her in a false light before the public.

For affirmance Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

For reversal—Justice O'HERN—1.