[Civ. No. 30040. Fourth Dist., Div. Three. Mar. 28, 1984.]

JEAN TYRA, Plaintiff and Appellant, v.
LEE KEARNEY et al., Defendants and Respondents.

**Counsel**

Paul M. Bell for Plaintiff and Appellant.

Reich, Adell & Crost and Paul Crost for Defendants and Respondents.

**Opinion**

**SONENSHINE, J.**—Jean Tyra appeals an order of summary judgment in favor of Lee Kearney and Local 952 of the International Brotherhood of Teamsters.

The sole issue we address is whether the trial court's jurisdiction to entertain Tyra's wrongful discharge action is preempted by the provisions of the Labor Management Reporting and Disclosure Act (Act).

Tyra, employed as a business agent for Local 952 since 1967, challenged Kearney for the office of secretary/treasurer in the 1980 election. Following Kearney's reelection, Kearney terminated Tyra who then filed this action for wrongful discharge, seeking an injunction and damages. Local 952's and Kearney's motion for summary judgment was granted. We affirm the court's determination the action was "preempted by federal law under the authority of *Finnegan* v. *Leu,* [456 U.S. 431, 72 L.Ed.2d 239] 102 S.Ct. 1867."

DISCUSSION

Tyra contends his cause of action is not preempted, claiming a federal court will not interfere with a state's sovereign power to hear and determine its own statutory causes of action for tortious conduct. This statement of law, while correct under some circumstances, is not applicable to Tyra.

Replacement of business agents by an elected labor union official is sanctioned by the Act and allowance of a claim under state law would interfere with the effective administration of national labor policy.

We do not find a California case directly on point and thus review the relevant federal authorities dealing with preemption in the labor relations field.

In *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773], the California courts granted an injunction and damages for picketing after the National Labor Relations Board had declined jurisdiction. The United States Supreme Court held California had no jurisdiction to decide the controversy, for "to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict." (*Id.,* at p. 247 [3 L.Ed.2d at p. 784].) The court discussed the extent to which state regulation is superseded by federal labor policy and administration, stating: "When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting." (*Id.,* at p. 243 [3 L.Ed.2d at p. 782].) The court recognized exceptions where the "activity regulated was a merely peripheral concern of the Labor Management Relations Act. [Citation.] Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." (*Id.,* at pp. 243, 244 [3 L.Ed.2d at p. 782].)

Tyra alleges subsequent cases have "eroded the effectiveness" of *Garmon,* but illogically leaps to the conclusion "federal law will not exercise its jurisdiction over a state's action for recovery in tort." We prefer to find the later cases clarify the dictates of *Garmon.*

Initially, we address and distinguish his cited authorities. In *Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657], a defamation action was allowed under state law. However, the defamation was determined merely peripheral to the concerns of the Act (the underlying arguably unfair labor practice of coercion and restraint of employees). "Judicial condemnation of the alleged attack on Linn's character would reflect no judgment upon the objectives of the union. It would not interfere with the Board's jurisdiction over the merits of the labor controversy." (*Id.,* at p. 64 [15 L.Ed.2d at p. 591].)

Intentional infliction of emotional distress to a plaintiff, discriminated against in the union hiring halls, provided the jurisdictional basis for a claim

under California law in *Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056]. In litigating the tort claim, "[t]he state court need not consider, much less resolve, whether a union discriminated or threatened to discriminate against an employee in terms of employment opportunities [activity prohibited under the Act]. To the contrary, the tort action can be resolved without reference to any accommodation of the special interests of unions and members in the hiring hall context." (*Id.*, at pp. 304, 305 [51 L.Ed.2d at p. 353].) However, the court continued, "concurrent state-court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme. . . . [I]t is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself."[1] (*Id.*, at p. 305 [51 L.Ed.2d at p. 353].)

*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180 [56 L.Ed.2d 209, 98 S.Ct. 1745] involved charges of trespass by the union while engaged in a protected activity, picketing. While "there is a constitutional objection to state-court interference with conduct actually protected by the Act" (*id.*, at p. 199 [56 L.Ed.2d at p. 227]) and the trespass itself conceivably *might* have been protected, the state court was nonetheless allowed to evaluate that issue as "a trespass is far more likely to be unprotected than protected." (*Id.*, at p. 205 [56 L.Ed.2d at p. 230].)

The above authorities deal with actions of the union directed against 1) union members in another's employ, distinct from the union itself, or 2) another employer. The claimed torts were separable from the underlying union activity and the potential for interference with the federal scheme was minimal. None involved an examination of or any relation to the union's own internal administrative policies.

We note the recent decision in *Cunningham* v. *Retail Clerks Union* (1983) 149 Cal.App.3d 296 [196 Cal.Rptr. 769]. Cunningham, a union office worker, was fired without receiving a written warning notice or opportunity to discuss it with the chief executive officer, provisions guaranteed by an interoffice memorandum. She filed charges before the National Labor Relations Board claiming violation of her rights under the Act because she was fired for actively supporting candidates opposing the new president. No complaint was issued by the board because the "case is one of the type the board declines to hear. . . . [i.e., for the board to issue a complaint] evidence must be presented to show the discharge was motivated by union

---

[1]Both *Farmer* and *Linn* placed limitations on the state courts to ensure any damages were fairly referrable *only* to the tort and additionally were not excessive.

animus and the conduct would have the foreseeable effect of either encouraging or discouraging union membership." (*Id.*, at pp. 303, 304.)

Cunningham then filed a contract action in state court "for breach of the oral or implied contract governing the conditions of her employment" (*id.*, at p. 300) based on the memorandum provisions. Finding jurisdiction, the court determined the conflict involved "interests unique to Cunningham and adjudication of these interests does not affect federal labor policies . . . ." (*Id.*, at p. 304.)[2] The jury awarded her $95,000 for backpay and lost pension.

*Cunningham* is distinguishable on its facts. Tyra does not contend he was peremptorily discharged in derogation of any office procedure guaranteed by contract. And unlike *Cunningham,* state court adjudication would be inconsistent with the objective of the Labor-Management Reporting and Disclosure Act.[3]

In *Finnegan* v. *Leu* (1982) 456 U.S. 431 [72 L.Ed.2d 239, 102 S.Ct. 1867], Leu defeated the incumbent in a union presidential election. The office carried with it authority to appoint and discharge business agents, several of whom had actively campaigned for the incumbent and were subsequently terminated by Leu. The agents filed suit in federal court alleging violation of the Act. Upholding summary judgment for Leu and Local 20, the Supreme Court stated: "Here, the presidential election was a vigorous exercise of the democratic processes Congress sought to protect. Petitioners—appointed by the defeated candidate—campaigned openly against respondent Leu, who was elected by a substantial margin. The Union's by-laws, adopted, and subject to amendment, by a vote of the union membership, grant the president plenary authority to appoint, suspend, discharge,

---

[2]The case at bench, like *Finnegan,* is decided pursuant to the Labor-Management Reporting and Disclosure Act, while *Cunningham* and the authorities cited by Tyra concerned the National Labor Relations Act. The issues, however, are the same—what constitutes preemption in the labor relations field.

[3]We are troubled by the *Cunningham* decision which makes no reference to *Finnegan* v. *Leu, supra,* 456 U.S. 431, holding termination of an appointive policymaking employee, under similar circumstances, sanctioned by the Labor Management Reporting and Disclosure Act. In footnote 11, page 441 [72 L.Ed.2d at p. 247], the *Finnegan* court specifically left "open the question whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employees," inferring Cunningham might be entitled to some federal protection. If so, the matter would be preempted as the "arbitrary" termination was arguably within the Act, regardless of action taken by the board. If not, preemption might be presumed because the termination, like Finnegan's, is sanctioned by the Act. However, we note the following distinctions: (1) the protection may differ between the National Labor Relations Act and the Labor Management Reporting and Disclosure Act; (2) the case may have been presented to the jury purely on the employer's refusal to present a written warning notice and confer; and (3) the court's inference may be incorrect regarding the jury's reason for its award.

and direct the Union's business agents, who have significant responsibility for the day-to-day conduct of union affairs. Nothing in the Act evinces a congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies." (*Id.*, at pp. 441, 442 [72 L.Ed.2d at pp. 247-248].)

■ Kearney was the authorized administrative director of Local 952, in charge of all labor disputes, and empowered by the union's bylaws to appoint and discharge the business agents. He had held the position for many years, weathering the regular elections required for the office. To promote the policies and programs promised to the electorate, he must have the unrestricted freedom "to choose a staff whose views are compatible with his own. . . . [T]he Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." (*Id.*, at p. 441 [72 L.Ed.2d at p. 247], fn. omitted.)[4]

Tyra's termination is sanctioned by the Act[5] and cannot therefore fall within the preemption exceptions termed "merely peripheral" to the concerns of the Act.[6] The basis for his cause of action for wrongful termination is the very activity protected or sanctioned by the Act as in *Garmon* and *Finnegan,* not a separate tort action that can be resolved without reference to Kearney's act of discharging him as in *Linn, Farmer* and *Sears.*[7]

The Act seeks uniformity in the regulation of employee, union and man-

---

[4]In *Cehaich* v. *International Union, U.A.W.* (6th Cir. 1983) 710 F.2d 234, plaintiff was terminated from his appointive position as benefits representative. The court quoted at length from *Finnegan* in affirming summary judgment for defendants. There, as here, plaintiff "could once again be appointed to the [subject] position if the local union leadership changed and [his superior] was replaced. He has not been accused of any wrongdoing which would prohibit him from being elected or appointed to any position in the union. His views are merely incompatible with those of the *present* leadership." (*Id.*, at p. 238, fn. 7.)

[5]Although the complaint alleged damages for mental distress, they were a function of the discharge itself and not of any particularly abusive manner by which the termination was effected. (See *Farmer* v. *Carpenters, supra,* 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056].)

[6]We note the paradox in denying a wrongful termination cause of action to Tyra yet allowing it for private sector employers. (*Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917].) However, we are compelled to follow the dictates of the Supreme Court.

[7]We do not address Tyra's contention there should be no preemption absent express legislative intent. "It long has been the rule that exclusion of state action may be implied from the nature of the legislation and the subject matter although express declaration of such result is wanting." (*Bethlehem Co.* v. *State Board* (1947) 330 U.S. 767, 772 [91 L.Ed. 1234, 1245, 67 S.Ct. 1026, 1029].)

agement relations. *Finnegan* found termination in this instance sanctioned under the Act; a subsequent state claim would allow another forum to restrict the exercise of the right to terminate which *Finnegan* found "an integral part of ensuring a union administration's responsiveness to the mandate of the union election." (*Finnegan* v. *Leu, supra,* 456 U.S. 431, 441 [72 L.Ed.2d 239, 247, 102 S.Ct. 1867].)[8]

We do not reach the purported merits of the case as we hold Tyra's claim for wrongful discharge against an elected official preempted by federal law.

Trotter, P. J., concurred.

**CROSBY, J.**—I reluctantly concur. Under compulsion of the union patronage dictum of *Finnegan* v. *Leu* (1982) 456 U.S. 431 [72 L.Ed.2d 239, 102 S.Ct. 1867], I conclude Tyra's cause is preempted. Beyond the reach of this plaintiff, California is fast developing a policy of protecting private sector employees at all levels from arbitrary discharge. (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917]; *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722].) I find it ironic, but nonetheless clear, that the wide scope of federal regulation of labor unions does not permit its potential application to employees of unions.

When a union activity is "arguably" covered by federal labor legislation, states may not interject themselves into its regulation. (*United Farm Workers Organizing Committee* v. *Superior Court* (1971) 4 Cal.3d 556, 564 [94 Cal.Rptr. 263, 483 P.2d 1215].) And "with regard to labor disputes, federal preemption of state law is the rule, not the exception." (*Bill Johnson's Restaurants, Inc.* v. *N.L.R.B.* (1983) 461 U.S. 731, 753 [76 L.Ed.2d 277, 296, 103 S.Ct. 2161, 2176] (conc. opn. of Brennan, J.).) Exceptions have only been found where the activity is of "merely peripheral [federal] concern . . . . [Citations.] Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had

---

[8]"No doubt this poses a dilemma for some union employees; if they refuse to campaign for the incumbent they risk his displeasure, and by supporting him risk the displeasure of his successor. However, in enacting title I of the Act, Congress simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff. Rather, its concerns were with promoting union democracy, and protecting the rights of union *members* from arbitrary action by the union or its officers." (*Id.,* at p. 442 [72 L.Ed.2d at p. 248].)

deprived the States of the power to act." (*San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 243-244 [3 L.Ed.2d 775, 782, 79 S.Ct. 773].)

No exception applies here, however, because *Finnegan* tells us there *is* a "compelling congressional direction" in this case: "[Federal law] does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own. [Fn. omitted.] Indeed, neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage. [Fn. omitted.] To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections. [Citation.] Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election. [¶] Here, the presidential election was a vigorous exercise of the democratic processes Congress sought to protect. Petitioners—appointed by the defeated candidate—campaigned openly against respondent Leu, who was elected by a substantial margin. The Union's bylaws, adopted, and subject to amendment, by a vote of the union membership, grant the President plenary authority to appoint, suspend, discharge, and direct the Union's business agents, who have significant responsibility for the day-to-day conduct of union affairs. Nothing in the Act evinces a congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies." (*Finnegan* v. *Leu, supra,* 456 U.S. 431, 441-442 [72 L.Ed.2d 239, 247-248].)

In light of the quoted language, I must concede issues touching union patronage are more than "arguably" within the ambit of federal labor regulation, at least in the Supreme Court's view; but several incongruities occasioned by *Finnegan* deserve mention. It seems to me odd that patronage, a system of such ill repute in our political history that few elected officials would publicly defend it, is encouraged by the federal government as a laudable feature of union democracy.

Also, *Finnegan* makes unions, who presumably exist in large part to protect members from arbitrary discipline and discharge by unionized employers, uniquely free to engage in just such conduct with their own employees. Perhaps even more anomalously, under California's emerging policy, the discharged vice president of an ordinary corporate employer has a potentially viable wrongful termination cause of action, although in all likelihood he holds a policymaking position (*Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d 311); but a union employee with relatively less authority and some seventeen years of service does not.

It should be noted *Finnegan* hints the distinction recognized by my colleagues between policymaking and nonpolicymaking employees might apply on the federal level as well. Two members of the Supreme Court concurred on that very point, and the lead opinion specifically limits the holding to policymaking positions. (*Finnegan* v. *Leu, supra,* 456 U.S. 431, 441, fn. 11 [72 L.Ed.2d 239, 247].) Thus, the holding of *Cunningham* v. *Retail Clerks Union,* (1983) 149 Cal.App.3d 296 [196 Cal.Rptr. 769] appears doomed to ultimate oblivion in the black hole of union activity "arguably" covered by federal regulation, despite the NLRB's refusal to intervene on Cunningham's behalf.

*Cunningham,* which does not mention *Finnegan,* seems to me irreconcilable with *Finnegan's* drift. Cunningham was a secretary in the union office (allegedly not a policymaking position). And the clear promise of *Finnegan,* reading the concurring opinion along with the lead opinion's footnote 11, is that nonpolicymaking employees of unions *will* be found to enjoy some modicum of *federal* protection *as employees* when that question is decided. In other words, Cunningham was probably not entitled to a forum in a California state court because her complaint was also "arguably" covered by the Act and thus federally preempted.

By quoting the NLRB's rejection of Cunningham's unfair labor practice complaint and by impliedly characterizing her wrongful discharge cause of action as a "derogation of [an] office procedure guaranteed by contract" (maj. opn., *ante,* p. 925), the majority chooses to avoid a nasty little problem by simply ignoring it. Cunningham, like Tyra, openly backed the wrong side in the union election, and her $95,000 judgment in the superior court was indisputably based on the union's exercise of its federally encouraged and protected patronage system: "It may be reasonably inferred from the jury's verdict they found Vandeveld's preference for a loyal staff a purely personal vindictive motive rather than a sufficient cause to fire Cunningham." (*Cunningham* v. *Retail Clerks Union, supra,* 149 Cal.App.3d at p. 302.)

Ironically, Tyra actually has a sounder preemption position than Cunningham, for he has no federal cause of action according to *Finnegan* and she may under the clear implication of the concurring opinion read with footnote eleven of the majority opinion. If Cunningham has a federal remedy, her state court case is clearly preempted. Of course, if the Supreme Court elects to further promote union patronage by extending *Finnegan* to nonpolicymaking union employees, her claim will also be preempted for the same reason we must conclude this one is.

Although troubled by our holding, which allows unions uniquely among the employers of this state to arbitrarily discharge employees of long tenure, I concur.