791 A.2d 1020 (2002)
348 N.J. Super. 164
Regina DZWONAR and Cynthia A. Burgess, Plaintiffs-Respondents,
v.
Robert McDEVITT and Local 54 of the Hotel Employees Restaurant Employees International Union, Defendants-Appellants,
and Alan M. Cohen, Jabiel Santiago, Albert Siciliano, and Local 54 Executive Board, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 22, 2002.
Decided February 15, 2002.
*1021 William T. Josem, Philadelphia, PA, argued the cause for appellants (Cleary & Josem, attorneys; Mr. Josem, of counsel; Regina C. Hertzig, on the brief).
Nelson C. Johnson, Hammonton, argued the cause for respondents (Nelson C. Johnson and Associates, attorneys; Mr. Johnson of counsel; Nancy A. Valentino, on the brief).
Before Judges HAVEY, BRAITHWAITE and COBURN.
The opinion of the court was delivered by COBURN, J.A.D.
This appeal by defendants Local 54 of the Hotel Employees and Restaurant Employees International Union ("Local 54" or the "union") and its president, Robert McDevitt, brings before us for review a judgment on two distinct causes of action that exceeds a half million dollars.
Plaintiff Regina Dzwonar's claim was based on the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8 ("CEPA"). The jury awarded her damages of $84,000, to which the trial court added prejudgment interest and an award of $168,459.37 for counsel fees and costs pursuant to N.J.S.A. 34:19-5(e).
Plaintiff Cynthia A. Burgess's claim was based on the tort of invasion of privacy. The jury awarded her compensatory damages of $250,000 and punitive damages of $50,000. The judge ordered prejudgment interest on the compensatory award.[1]
Defendants moved for judgment, pursuant to Rule 4:40-1, when plaintiffs concluded the presentation of their evidence, and they renewed their motion, pursuant to Rule 4:40-2(b), following the verdict. The trial court denied both motions. Since the CEPA claim is preempted by the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C.A. § 401 to § 431, and the invasion of privacy was not proved, defendants' motions should have been granted. Therefore, we reverse and remand for entry of judgment for defendants.

I

DZWONAR'S CEPA CLAIM
A. Facts
Local 54 is a labor organization subject to LMRDA. It represents approximately 15,000 employees in the hotel and restaurant industries in Atlantic City and elsewhere in southern New Jersey. Robert McDevitt was elected its president in 1996. *1022 The union is governed by an Executive Board in accordance with bylaws approved by the membership. General membership meetings occur quarterly while the Executive Board meets monthly or more frequently when required. Under the bylaws, virtually all Executive Board actions are subject to subsequent approval by the general membership.
Dzwonar, a member of the Union since 1983, was elected its Recording Secretary, an unpaid office, in 1996. Later that year, she was appointed by the union, as an at-will employee, to the full-time, paid position of Arbitration Officer, which entails representation of the union at arbitration proceedings. Dzwonar and McDevitt had numerous, intense disagreements about union business. On September 19, 1997, McDevitt, with the approval of the Executive Board, discharged her from the paid position because, according to him, she had behaved inappropriately at an arbitration hearing and was engaged in numerous disputes with other union members.
In support of her CEPA claim, Dzwonar identified a few actions taken by McDevitt, the Executive Board, or both, which she viewed as precipitating violations of LMRDA. Those actions concerned hiring of a business agent, authorization of overtime pay to the controller, issuance of credit cards to certain union officers, payment of rent for a newly hired organizer, and arrears in dues owed the international. She did not contend that any of the actions were violations of the law in themselves. Instead, she asserted that the Executive Board violated the law by failing to inform and obtain approval from the general membership on those actions. Although she also asserted that the members were being denied the right to participate freely in the general meetings, there was no evidence to support that claim.
The true thrust of Dzwonar's case, as is evident from her brief, was the refusal of the Executive Board to read or distribute the minutes of its meetings at the meetings of the general membership. She put it this way:
Dzwonar was familiar with Local 54's By-laws and the LMRDA prior to attending the George Meaney Center for Labor Studies in May of 1997. At Meaney she learned that many union locals were reading their Executive Board minutes at general membership meetings in order that the members could deliberate and vote upon the actions being taken by the Board. Upon her return to Atlantic City, Dzwonar pursued this issue further, demanding that the general membership be informed of, and approve, all Executive Board actions.
Dzwonar testified that she repeatedly advised McDevitt that she believed the By-laws and the LMRDA were being violated by his refusal to share information with the general membership concerning such matters as hirings, salaries, credit cards, etc. Reading the Executive Board minutes to the general membership was the means by which Dzwonar believed the members could be best informed of the Executive Board actions and could be given the opportunity to deliberate and vote upon those actions. When she received no response from McDevitt to her repeated complaints and objections, Dzwonar prepared and distributed a memo on July 14, 1997 regarding the minutes. Dzwonar testified at trial that her memo was provided to all the members of the Executive Board and they still refused to permit the Minutes of the Executive Board to be made available to the general membership.

[Emphasis added.]
The July 14 memorandum, which makes no mention of LMRDA, reads as follows:
*1023 There is some feedback from the rank and file that some members are suggesting that we are violating the By-Laws because we do not read the minutes of the E[xecutive] Board meetings into the record at the G.M. meeting. We should at least offer them even if we ask for a motion to enter them as read. I really think we should address this A.S.A.P.

[Emphasis added.]
The bylaws, however, contain no provision requiring that Executive Board minutes be read at the general membership meetings. Indeed, they are to the contrary. Article III(b) provides that "[a]ll meetings shall be conducted in accordance with Robert's Rules of Order." The following paragraph from that book was read to the jury:
A record of the Board proceedings should be kept by the secretary .... These minutes are accessible only to the members of the Board unless the Board grants permission to a member of the society to inspect them or unless the society, by a two-thirds vote or vote of a majority of the total membership, or a majority vote if previous notice is given, orders the Board's minutes to be produced and read to the society's assembly.
Moreover, the evidence was uncontradicted that members of Local 54 could make an appointment to review Executive Board minutes and that some did from time to time.
B. Discussion
The only laws that Dzwonar says she reasonably believed had been violated by the failure to read Executive Board minutes at general membership meetings are sections 411(a)(1) and (2) of LMRDA, which, in pertinent part, provide as follows:
Every member of a labor organization shall have equal rights and privileges within such organization to ... participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

[29 U.S.C.A. § 411(a)(1).]
Every member of any labor organization shall have the right ... to express at meetings of the labor organization his views, ... upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings....

[29 U.S.C.A. § 411(a)(2).]
Dzwonar's claim is founded on CEPA, which, in pertinent part, provides as follows:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:
c. Objects to ... any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law ...
[N.J.S.A. 34:19-3c(1).]
CEPA was designed to provide "broad protections against employer retaliation" for employees acting in the public interest, Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179, 707 A.2d 1000 (1998), and as remedial legislation it "should be construed liberally to effectuate its important social goal." Abbamont v. Piscataway Township Bd. of Edue., 138 N.J. 405, 431, 650 A.2d 958 (1994) (citation omitted). Nonetheless, we believe this CEPA claim is preempted by the LMRDA because it is based solely on an alleged LMRDA violation implicating neither federal nor state criminal law.
The elementary premises regarding federal preemption of state law are described *1024 in Maher v. New Jersey Transit R.O., 125 N.J. 455, 463-66, 593 A.2d 750 (1991), and need not be reiterated at length. However, certain of the propositions mentioned by the Court are especially pertinent here:
Whether a state law establishing a cause of action is preempted in a given case is a question of congressional intent.
Finally, even in the absence of express language or implied congressional intent to occupy the field, a court must find state law to be preempted "to the extent that it actually conflicts with federal law." Such conflict is found ... if the local law impedes the accomplishment of the full purposes and objectives of Congress acting pursuant to its constitutional powers. The relative importance to the State of its own law is not material when that law conflicts with a valid federal statute.

[Id. at 464-65, 593 A.2d 750 (citations omitted).]
Maher also discusses the doctrine of preemption in the particular context of labor law, noting that, "[a]lthough congressional preemptive power in the field of labor relations is well established," Congress "has never exercised authority to occupy the entire field in the area of labor legislation." Id. at 465, 593 A.2d 750 (citations omitted). Ultimately, the issue is one of congressional intent. Ibid.
Preemption of state law in this context is governed by the LMRDA, which admittedly contains no express limitation of the right of states to protect union employees from discharge in retaliation for conduct falling within a law such as the CEPA. Nevertheless, we believe such a limitation may be inferred from the federal act's scope, at least where the purported violation of law does not involve criminal conduct.
A useful starting point for an understanding of the scope of the LMRDA in this context is Finnegan v. Leu, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). That action arose when the union's newly elected president dismissed a number of appointed business agents as employees of the union because they were loyal to the former president. The business agents sued in federal court, alleging that their termination violated the LMRDA.
The court upheld the dismissal, reasoning, in part, that the LMRDA only protected membership rights, not the rights of union employees. 456 U.S. at 437-42, 102 S.Ct. at 1871-74, 72 L.Ed.2d at 245-48. As to union employees serving as administrators, the court held that the Act "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." 456 U.S. at 441, 102 S.Ct. at 1873, 72 L.Ed.2d at 247. The court emphasized that this freedom "is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." Ibid.
Although Finnegan is not a preemption case, it has been interpreted as requiring preemption with respect to the discharge of union employees with policy-making responsibilities, as distinguished from ordinary clerical personnel, with the most far reaching view being expressed by the Supreme Court of California in Screen Extras Guild, Inc. v. Superior Court, 51 Cal.3d 1017, 275 Cal.Rptr. 395, 800 P.2d 873 (1990).
Screen Extras involved a wrongful termination action by a business agent fired for allegedly deficient performance. However, the agent claimed that the union "discharged her in violation of the covenant of good faith and fair dealing in the employment contract between them." Id. 275 Cal.Rptr. 395, 800 P.2d at 879. In rejecting the claim as preempted by federal law, based on what it considered to be *1025 the logical implications of Finnegan, the court said this:
Democratic union governance dictates that elected union officials be responsive to the will of their union membership-electorate. To effectuate this policy, elected union officials have the authority to discharge union employees in management or policymaking positions who do not, in their opinion, serve the union membership properly. Permitting former union employees who held management or policymaking positions to bring state actions against the unions which employed them, or against the officials of such unions, premised on their discharge, would undermine the ability of elected union leaders to effectuate the will and policies of the union membership they represent. Thus, the strong federal policy favoring union democracy, embodied in the LMRDA, preempts state causes of action for wrongful discharge or related torts when brought against a union-employer by its former management or policymaking employee.
[Id. 275 Cal.Rptr. 395, 800 P.2d at 874.]
Although Screen Extras adopted a broad rule that all wrongful termination actions by policy-making employees were preempted, it acknowledged that other courts had taken a narrower view when the termination was based on the employee's refusal to engage in criminal activity. Id. 275 Cal.Rptr. 395, 800 P.2d at 877-78.
For example, in Bloom v. General Truck Drivers, 783 F.2d 1356 (9th Cir.1986), a union's business manager was fired, according to the union, because he was a political threat to a rival officer. Id. at 1358. He brought suit claiming under state law that he was actually discharged "for refusing to alter the minutes of a union meeting to cover up an unapproved expenditure (in effect an embezzlement) of union funds by other union officers," an act violative of California's criminal code prohibiting embezzlement. Id. at 1360-61. The court held that the action was not preempted by the LMRDA, observing that "[p]rotecting such a discharge by preempting a state cause of action based on it does nothing to serve union democracy or the rights of union members; it serves only to encourage and conceal such criminal acts and coercion by union leaders." Id. at 1362.
Bloom was followed in Montoya v. Local Union III of I.B.E.W., 755 P.2d 1221 (Colo.App.1988), which involved an action for wrongful discharge by a union's assistant business manager. He alleged that he was fired for two reasons: uncovering criminal management practices by the business manager and for not supporting the latter's choice for vice-president of the union.
The Montoya court held that the part of plaintiff's wrongful discharge claim that was based on "internal union political reasons" was preempted, id. at 1224, but that the claim for termination based on his resistance to criminal activity was not preempted:
We adopt the Bloom exception to federal preemption to the extent a claim is based on an employee's unwillingness to aid his superior in the violation or concealment of a violation of a criminal statute. Both Colorado and federal statutes make embezzlement from a labor organization unlawful. Thus, the doctrine of preemption is not a bar to plaintiff's action here, insofar as he alleges that he was discharged because he refused to aid [the business manager] in his alleged criminal misuse of union funds.

[Ibid.]

When our courts have not had occasion to resolve an issue, as is the case here, it is appropriate that we seek guidance from the courts of other jurisdictions to the *1026 extent that they are persuasive and consistent with the existing law of preemption in the federal labor context. See, e.g., Pomanowski v. Monmouth Cty. Bd. of Realtors, 89 N.J. 306, 313-14, 446 A.2d 83, cert, denied, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); Cemetery Workers v. Rom. Cath. Diocese of Newark, 127 N.J.Super. 277, 280, 317 A.2d 363 (App. Div.), certif. denied, 65 N.J. 563, 325 A.2d 697 (1974).
Applying the principles set forth in Screen Extras, Bloom, and Montoya to Dzwonar's claim convinces us that the trial court erred in failing to grant defendants' motions for judgment. There is no suggestion in this record that defendants' activity was criminal in nature. Rather, this case involves, at most, the federal regulatory scheme and the union's own internal operating policies.[2] Dzwonar, in her appointed position as an arbitration officer, was charged with the responsibility of representing the union at arbitration proceedings; thus, she was not merely a clerical employee. Rather, she had significant responsibilities of a confidential and policy-making nature. Or, to employ a phrase from Finnegan, supra, she had "significant responsibility [in her capacity as arbitration officer] for the day-to-day conduct of union affairs." 456 U.S. at 441-42, 102 S.Ct. at 1873, 72 L.Ed.2d at 247-48. The essence of her dispute with McDevitt and the Executive Board was over policy relating to the manner and extent of providing information to the general membership. Thus, even assuming that she was dismissed from her employment because she reasonably believed that the LMRDA required more of defendants, that policy dispute cannot in itself form the basis of a CEPA claim. Finnegan, supra, 456 U.S. at 442, 102 S.Ct. at 1873, 72 L.Ed.2d at 248.[3]

II

BURGESS'S INVASION OF PRIVACY CLAIM
A. Facts
Burgess began her employment with Local 54 in 1978. By the mid-eighties she *1027 had risen to the position of business agent. In 1996, she was transferred to the union's Cherry Hill office, a move that pleased her because, among other things, it was closer to her home. Like Dzwonar, she believed that the minutes of the Executive Board meetings should be read to the membership, and she pressed this issue with McDevitt. He responded by transferring her back to the Atlantic City office, more than doubling her commuting time. On November 17, 1997, immediately after returning to Atlantic City, she attempted to mail minutes of the Executive Board meetings to a secretary in the Cherry Hill office. The mailing was intercepted by a vice-president of the union, who suspended her that day, pending further action by McDevitt.
To Burgess the suspension was "the straw that broke the camel's back," prompting her to immediately consult with her doctor, who advised that she apply for State of New Jersey disability benefits with respect to her mental condition, which she described as involving anxiety and panic attacks. She explained the initial steps of the application procedure as involving submission of the application to the union comptroller, who would transmit it to McDevitt, who, in turn, would forward it to the administrative agency in Trenton.
Within a couple of days, Burgess met with McDevitt, who criticized her for attempting to send the minutes, some of which had not even been approved by the Executive Board, to an unauthorized person. By letter dated November 17, 1997, McDevitt dismissed her from her employment for using poor judgment in "her mishandling of Local 54's internal documents."
On December 1, 1997, McDevitt sought and obtained the necessary approval from the Executive Board of his decision to fire Burgess. The pertinent portion of the minutes of that meeting, which includes the comment on which this law suit is based, reads as follows:
Bob [McDevitt]: I was in New York and got a call from Jabiel [Santiago, the Union's Financial Secretary-Treasurer] regarding this envelope. Approved minutes from September 2nd. Minutes and (sic) that were tabled from the 19th. Asterix (sic) about gas card discussion from Joe Bruckler.
Cindy [Burgess] was spoken to the following Tuesday. Friday she filed for disability which would by paid for by union (6 months). On Tuesday I asked her why she would send unapproved minutes to someone (sic) home (Terry Martinez). It would be bad enough if they were approved, but some were unapproved. I asked her why she would send them to someone who is not a member. She said, she got them a month prior in the mail in Cherry Hill. She said she had copies at office as practice. She got in mail didn't know where they came from. We (Al [Cohen, the Union's Vice President] & Bob [McDevitt]) looked for file, couldn't find them.... I said as such, why would you not check with the Secretary Treasurer? Cindy answered, I didn't think to check if they were approved and didn't trust Joe Bruckler [a fellow Business Agent]. I am left with conclusion that they were going to use minutes to disrupt the General Membership Meeting. Not credible for 12 year Executive Board, 20 year member to do this. told her I would get back to her and then I found out that she filed for mental disability. I sent her a letter stating that she was terminated. I don't know why she did it and I don't need to know why. I am asking the board to terminate her.

[Emphasis added.]
McDevitt testified that he told the Executive Board about Burgess's mental disability *1028 application because he "was relaying to the Executive Board the sequence of events" and "that was certainly something that had to do with her job." For example, he indicated that the union would be responsible for part of the disability payments.
Burgess testified that Dzwonar, the one member of the Executive Board who voted against her dismissal, called her after the meeting and told her about McDevitt's reference to her mental disability, noting that he had made "a mockery of it," stressing the word "mental." Two other union members mentioned it to Burgess as well, and according to Burgess, the news "got around quickly like wildfire."
On December 30, 1997, Burgess attempted to commit suicide, after which she was hospitalized for a time, with psychiatric treatment continuing at the time of trial.
On February 9, 1998, Burgess's application for mental disability benefits was disclosed again at the union's general membership meeting. Approximately fifty to sixty members were present. The meeting had been called because the Executive Board had determined that all of its minutes from September 1997 to the present should be read to the membership. Included in the reading were the minutes of December 1, 1997, which, as noted above, mentioned Burgess's administrative agency application for mental disability benefits. The subject was not discussed at the general meeting.
Burgess testified at some length about the emotional distress she suffered, though it is clear from her testimony and the medical evidence she offered, that most of the stress was due to the loss of employment. As she said in her brief, she "was devastated by the loss of her job."
B. Discussion
Burgess contends that defendants invaded her privacy by giving publicity to an aspect of her private life when her claim for mental disability benefits was reported to the Executive Board and thereafter disclosed to the general membership.
The Restatement of Torts defines Burgess's cause of action, invasion of privacy by giving publicity to private life, as follows:
One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his [or her] privacy, if the matter publicized is of a kind that
(a) would be highly offensive to a reasonable person, and
(b) is not of legitimate concern to the public.

[Restatement (Second) of Torts § 652D (1977) (emphasis added).]
The Restatement`s commentary make these points, which are pertinent to Burgess's claim. It defines "publicity," distinguishing that concept from "publication," as meaning
that the matter is made public[ ] by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.
Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

[Id., cmt. a (emphasis added).]
It also addressed the situation where legal proceedings are reported as follows:

*1029 The rule stated in this Section applies only to publicity given to matters concerning the private, as distinguished from the public, life of the individual. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public. Thus there is no liability for giving publicity to facts about the plaintiff's life that are matters of public record, such as ... the pleadings that he [or she] has filed in a lawsuit.

[Id., cmt. b (emphasis added).] In Romaine v. Kallinger, 109 N.J. 282, 297, 537 A.2d 284 (1988), the Court cited Section 652D as reflecting the law of this State, while noting that since it permits recovery for truthful disclosures, it "creates significant potential for conflict with the guarantees contained in the first amendment of the Constitution." Id. at 298, 537 A.2d 284 (citing Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 489, 95 S.Ct. 1029, 1043, 43 L.Ed.2d 328, 346 (1975)).
The Court went on to hold that a defendant who published a book reporting facts "contained in non-confidential official court records of ... [a] trial" could not be sued for invasion of privacy. Id. at 298-99, 537 A.2d 284. As the Court also observed: "If the facts are public information, even though they relate to matters of individual privacy, they cannot for these purposes be considered `private.'" Id. at 298, 537 A.2d 284. On the other hand, not all governmental records are "public records." In Romaine, after noting that the phrase "`public records' is not self-defining," the Court said that it did not have to "determine the extent to which particular official governmental records place facts in the public domain." Id. at 298-99, 537 A.2d 284.
At oral argument, Burgess necessarily conceded that the Executive Board was entitled to know about her application for mental disability benefits because it had the right to contest her claim in the administrative proceedings before the Division of Unemployment and Temporary Disability Insurance ("Division"). N.J.S.A. 43:21-49. Moreover, given the small size of the board, it is unlikely that informing its members of even private information would fall within the category of "publicity" under Section 652D. In any case, what was revealed to the Executive Board was not, as a matter of law, her mental condition, but the contents of the pleading she had filed with the administrative agency. Under both Romaine and the Restatement, that was nothing other than a proper disclosure of a public record. In other words, we perceive no difference between a "pleading ... filed in a lawsuit," Restatement (Second), supra, Comment b, and a pleading filed with the Division seeking temporary disability benefits. Disclosure of the contents of such public records does not give rise to a cause of action for invasion of privacy.
Burgess also acknowledged that the union membership, the ultimate source of power in this democratic institution, would be entitled to vote on the question of whether an application for disability benefits should be opposed by the Executive Board. That right, of course, flows from both sections 411(a)(1) and (2) of the LMRDA, quoted above, and the union's bylaws. Furthermore, she herself was one of the union members battling for the right to have the Executive Board minutes read to the general membership. Given these circumstances, we perceive no fair basis on which this suit should have been submitted to the jury.
Reversed and remanded for entry of judgment for defendants.
NOTES
[1] With respect to both plaintiffs, the trial court failed to include the amount of prejudgment interest in the judgment, contrary to Rule 4:42-11(b), but apparently intended interest to run from the filing of the joint complaint. Since the complaint was filed approximately two years before entry of judgment, the intended interest exceeds $30,000.
[2] Other causes of action such as defamation or intentional infliction of emotional distress or perhaps other statutory actions, such as a claim under the Law Against Discrimination, N.J.S.A. 10:5-1 to -42, may well be maintainable depending on the circumstances, because they allege conduct that is "merely a peripheral concern" of the LMRDA or "touch[] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." Tyra v. Kearney, 153 Cal.App.3d 921, 200 Cal.Rptr. 716, 717 (1984) (quoting San Diego Bldg. Trades Coun. v. Garmon, 359 U.S. 236, 243-44, 79 S.Ct. 773, 778, 3 L.Ed.2d 775, 782 (1959)). Those kinds of lawsuits, observed the court in Tyra, are "separable from the underlying union activity and the potential for interference with the federal scheme [is] minimal. None involve[ ] an examination of or any relation to the union's own internal administrative policies." 200 Cal.Rptr. at 718. See also Farmer v. Carpenters, 430 U.S. 290 holding 305-07, 97 S.Ct. 1056, 1065-66, 51 L.Ed.2d 338, 353-54 (1977) (no preemption of intentional infliction of emotional distress claim against union by member).
[3] We note that Dzwonar's brief entirely fails to address defendants' preemption theory on its merits. Instead, she argues that they were barred from raising it because they failed to file a notice of removal to federal court under 28 U.S.C.A. § 1441(a). She provides no authority in support of her position, which is clearly unsound since a defense of ordinary preemption, as distinguished from complete preemption, does not normally allow removal to a federal court. See Caterpillar, Inc. v. Williams, 482 U.S. 386, 393, 107 S.Ct. 2425, 2430, 96 L.Ed.Id2d 318, 327 (1987); Joyce v. RJR Nabisco Holdings Corp., 126 F.3d 166, 171 (3d Cir.1997); and Collins v. Baxter Healthcare, 949 F.Supp. 1143, 1149 (D.N.J. 1996).