No. 01-784

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 219

CHARLES J. VITULLO,

        Plaintiff and Appellant,

    v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 206, a union,

        Defendant and Respondent.


APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark, Cause No. CDV-2000-193,
Honorable Thomas C. Honzel, Judge Presiding

COUNSEL OF RECORD:

        For Appellant:

        Antonia P. Marra, Bell & Marra, Great Falls, Montana

        For Respondent:

        D. Patrick McKittrick, McKittrick Law Firm, Great Falls, Montana


        Submitted on Briefs:  February 21, 2002

        Decided:  August 25, 2003

Filed:

_____
        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      The Appellant, Charles J. Vitullo (Vitullo), brought this action in the Montana First Judicial District Court, Lewis and Clark County, seeking compensatory and punitive damages for wrongful discharge from employment by the Respondent, International Brotherhood of Electrical Workers, Local 206 (IBEW), in violation of § 39-2-904(1)-(3), MCA (1999).  The District Court granted summary judgment in favor of IBEW, concluding that the Montana Wrongful Discharge From Employment Act, § 39-2-901 et seq., MCA, was preempted by the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 et seq.  From this judgment Vitullo now appeals.  We affirm.

¶2      Vitullo raises the following issue on appeal:

¶3      *Did the District Court err when it concluded that the LMRDA preempted Vitullo's state law claims under the Montana Wrongful Discharge From Employment Act?*

*BACKGROUND*

¶4      Prior to his termination, Vitullo was employed by and was a member of Local 206, IBEW, in the position of assistant business manager and organizer.  In approximately 1992, Clark Spranget, the union's elected business manager, hired Vitullo, who was at the time working for U.S. West as a fiber optic cable layer, as the assistant business manager and later included the responsibilities of organizer.   Vitullo worked for Spranget for approximately seven years until his employment was terminated on April 2, 1999.

¶5      In approximately March of 1999, Vitullo told Spranget that he (Vitullo) had been asked to accept the nomination for election to Spranget's current position, that of business

2

manager for Local 206. Soon thereafter, Spranget advised Vitullo that his decision to run for the position of business manager, while serving in the capacity of assistant business manager, was a conflict of interest. Spranget advised Vitullo that if Vitullo did run for the position of business manager, his employment as the assistant business manager and organizer would be terminated.

¶6 On April 1, 1999, Vitullo, as well as several other union members, accepted nominations to run for the business manager position against Spranget. Spranget then terminated the employment of Vitullo from Local 206. After his termination, Vitullo filed a complaint with the National Labor Relations Board (NLRB). The NLRB advised Vitullo that, under the circumstances, he did not have a case and would be better off dropping it. Vitullo thereafter dropped the charges and filed the instant action.

¶7 In granting summary judgment in favor of IBEW, the District Court determined that Vitullo had no recourse for his firing under the Montana Wrongful Discharge From Employment Act because IBEW's constitution gives the business manager authority to hire and fire assistants at any time, specifically providing that appointed officials shall not work in conflict with the business manager. In making this determination, the District Court concluded that the hiring and firing provisions of IBEW's constitution preempted the Montana Wrongful Discharge From Employment Act, as the overriding purpose of the LMRDA is to ensure that unions would be democratically governed and responsive to the will of the membership, and the ability of an elected official to choose a staff whose views

3

are compatible with his or her own is necessary and integral to protecting this democratic process.

¶8    From this judgment, Vitullo now appeals.

*STANDARD OF REVIEW*

¶9    The standard of review for summary judgment is *de novo*. This Court will apply the same evaluation as the district court based upon Rule 56, M.R.Civ.P. Appellant here challenges the District Court's conclusion of law. Our standard of review of a question of law is whether the legal conclusions of the trial court are correct. *Gonzales v. Walchuk*, 2002 MT 262, ¶ 9, 312 Mont. 240, ¶ 9, 59 P.3d 377, ¶ 9.

*DISCUSSION*

¶10    *Did the District Court err when it concluded that the LMRDA preempted Vitullo's state law claims under the Montana Wrongful Discharge From Employment Act?*

¶11    The District Court concluded that Vitullo's state law claims were preempted by the LMRDA. Based on *Finnegan v. Leu* (1982), 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239, the District Court concluded that, by passing the LMRDA, Congress sought to promote union democracy and responsiveness, and that, integral to promoting democracy, is "the ability of an elected union president to select his own administration[, thus] ensuring a union administration's responsiveness to the mandate of the union election." *See Finnegan*, 456 U.S. at 441, 102 S.Ct. at 1873, 72 L.Ed.2d at 247. The District Court concluded that, similar to the union bylaws in *Finnegan*, the IBEW's constitution gives the locally elected business manager the authority to appoint and to discharge assistants at any time. The District Court further noted that IBEW's constitution, in Article XVI, Section 2, provides that assistants

4

appointed by the business manager shall cooperate with and not work in conflict with the business manager, language similar to the democratically adopted union bylaws in *Finnegan*.

¶12    The District Court also relied upon the two California cases of *Screen Extras Guild, Inc. v. Superior Court* (Cal. 1990), 800 P.2d 873, and *Tyra v. Kearney* (1984), 153 Cal.App.3d 921, noting that the California Supreme Court and the California Court of Appeals, both relying upon *Finnegan*, have held that the strong policy favoring union democracy in the LMRDA preempts state causes of action for wrongful discharge or related torts "when brought against a union-employer by its former management or policymaking employee."  *See Screen Extras Guild*, 800 P.2d at 874.

¶13    Neither this Court nor the United States Supreme Court easily favors preemption. *Dukes v. Sirius Constr., Inc.*, 2003 MT 152, ¶ 18, 316 Mont. 226, ¶ 18, ___ P.3d ___, ¶ 18; *see also Favel v. American Renovation and Constr. Co.,* 2002 MT 266, ¶ 39, 312 Mont. 285, ¶ 39, 59 P.3d 412, ¶ 39, and *Medtronic, Inc. v. Lohr* (1996), 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715.

¶14    This Court recognizes three ways in which federal law may preempt state law. *Dukes*, ¶ 20; *Favel*, ¶ 40.  The first is by express preemption, wherein Congress includes a preemption clause providing that state law will not apply in the area governed by the federal statute. Absent express preemption, this Court recognizes two types of implied preemption. The first is "field preemption," wherein the scheme of federal regulation is so pervasive or comprehensive that it is reasonable to infer that Congress intended to "occupy the field" and leave no room for supplementary state regulation.  *Dukes*, ¶ 20; *Favel*, ¶ 40.  The second

5

type of implied preemption is "conflict preemption." Conflict preemption manifests itself as an inability of state law to comply with federal law or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Dukes*, ¶ 20; *Favel*, ¶ 40 (citing *Hillsborough County v. Automated Medical Labs.* (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721).

¶15 "Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Dukes*, ¶ 19; *Favel*, ¶ 39 (citing *Sleath v. West Mont Home Health Services*, 2000 MT 381, ¶ 23, 304 Mont. 1, ¶ 23, 16 P.3d 1042, ¶ 23).

¶16 Vitullo stresses that the United States Supreme Court in *Finnegan* did not discuss whether the LMRDA preempts state law regarding wrongful discharge or other violations of state law, but, rather, held that the LMRDA itself applies only to union members and not to appointed officials. Vitullo argues therefrom that *Finnegan* does not answer or address the question of whether state remedies are available for appointed officials who are discharged from employment.

¶17 Vitullo also contends that the two California cases relied on by the District Court are inapplicable because, in both cases, the union's definition of "at will" employment was consistent with California's statutory definition, whereas, in the instant case, Montana labor law, in Vitullo's view, is significantly different than the practices permitted by IBEW's

6

constitution. Specifically, Vitullo contends that this Court has previously held, in *Foster v. Albertsons* (1992), 254 Mont. 117, 835 P.2d 720, that federal labor law does not preempt or prevent an employee from suing for a discharge which is in violation of public policy.

¶18     In *Foster*, this Court held, in part, that the Labor Management Relations Act of 1947 did not preempt the plaintiff's retaliatory discharge claim because her claim, based upon allegations of sexual harassment and subsequent retaliatory discharge for resisting her supervisor's advances, was a state law cause of action independent of the collective bargaining agreement for purposes of the Act.  *Foster*, 254 Mont. at 127, 835 P.2d at 727. Noting that the United States Supreme Court had held that "a state-law claim is preempted by [the Act] only where its resolution requires construing the collective bargaining agreement," *Foster*, 254 Mont. at 126, 835 P.2d at 726 (quoting *Lingle v. Norge Division of Magic Chef, Inc.* (1988), 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410), the Court determined that none of the factual questions at issue turned on the meaning of any term of the bargaining agreement, and therefore, the discharge claim was not preempted by the Labor Management and Relations Act.  The Court did not, as argued by Vitullo, adopt a blanket rule that state wrongful discharge actions based upon violations of public policy can never be preempted by federal labor law, nor would such an approach comport with a proper preemption analysis.  *See Dukes,* ¶ 20 (discussing the three ways in which federal law may preempt state law).

¶19     We thus turn our attention to the cases relied upon by the District Court in determining that the LMRDA preempts the Montana Wrongful Discharge From Employment

7

Act. The facts in *Finnegan* are similar to those in the instant case. There, the petitioners, business agents of the local union, openly campaigned for the incumbent president of the union who, in turn, lost the election. Upon assuming office, the newly elected president discharged the petitioners and the Local's other business agents, all of whom had been appointed by the previous president. *Finnegan*, 456 U.S. at 433-34, 102 S.Ct. at 1869, 72 L.Ed.2d at 242-43. The petitioners filed suit in the United States District Court, alleging that they had been terminated from their appointed positions in violation of the LMRDA. *Finnegan*, 456 U.S. at 434, 102 S.Ct. at 1869-70, 72 L.Ed.2d at 243.

¶20 The petitioners relied on 29 U.S.C. §§ 411(a)(1) and (2), which guarantee equal voting rights and rights of free speech and assembly "to [every] *member* of a labor organization." *See Finnegan*, 456 U.S. at 436, 102 S.Ct. at 1870, 72 L.Ed.2d at 244 (emphasis in original). Considering the above statute and the language in 29 U.S.C. § 529 of the LMRDA, which renders it unlawful for a union or its representatives "to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter," the Supreme Court concluded that the statutory language, in conjunction with the legislative history, made it readily apparent that it was only the rank-and-file union members, not union officers or employees, whom Congress sought to protect under the LMRDA. *See Finnegan*, 456 U.S. at 436-37, 102 S.Ct. at 1870-71, 72 L.Ed.2d at 244.

¶21 The Supreme Court further concluded that the petitioners' dual status as both employees and members of the union was immaterial in light of the fact that the LMRDA

8

was intended to protect only members, not appointed officials, from retaliatory discharge. *Finnegan*, 456 U.S. at 438, 102 S.Ct. at 1871, 72 L.Ed.2d at 245-46. The Supreme Court thus concluded that the LMRDA was not designed or intended to protect from suspension a member's status as an officer of the union, holding that "removal from appointive union employment is not within the scope of those union sanctions prohibited by [the LMRDA]." *Finnegan*, 456 U.S. at 439, 102 S.Ct. at 1872, 72 L.Ed.2d at 246.

¶22　Thus, while we agree with Vitullo that the Supreme Court did not directly address the issue of whether the LMRDA preempted state labor law, but only whether the LMRDA applied to removal of union officials, this does not end the inquiry. The Supreme Court further addressed whether the petitioners' rights as *members* were infringed by the termination of their union employment, as the petitioners had alleged an *indirect* interference with their membership rights, "maintaining that they were forced to '[choose] between their rights of free expression . . . and their jobs.'" *Finnegan*, 456 U.S. at 440, 102 S.Ct. at 1872-73, 72 L.Ed.2d at 247.

¶23　The Supreme Court concluded that the LMRDA "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Finnegan*, 456 U.S. at 441, 102 S.Ct. at 1873, 72 L.Ed.2d at 247.

> Indeed, neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage. To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections. Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election.

9

*Finnegan*, 456 U.S. at 441, 102 S.Ct. at 1873, 72 L.Ed.2d at 247 (citation omitted).

¶24    Further, the Supreme Court noted that the presidential election in *Finnegan* was itself an exercise of the democratic process wherein the petitioners, appointed by the defeated incumbent, campaigned openly and vigorously against the winner of the election. Critical to this process was the union's bylaws, adopted and "subject to amendment, by a vote of the union membership," and which "grant the president plenary authority to appoint, suspend, discharge, and direct the Union's business agents, who have significant responsibility for the day-to-day conduct of union affairs. Nothing in the Act evinces a congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies." *Finnegan*, 456 U.S. at 441-42, 102 S.Ct. at 1873, 72 L.Ed.2d at 247-48.

¶25    Vitullo correctly notes that the LMRDA does not expressly preempt state law, nor, by its own provisions, does the LMRDA seek to occupy the field of labor law, leaving states no room to enact its own labor laws. 29 U.S.C. § 523(a), provides:

> Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State.

¶26    Absent express or implied field preemption, we are left with the question of whether the Montana Wrongful Discharge From Employment Act, under the present facts, stands as an obstacle to the accomplishment and the execution of the full purposes and objectives of

the LMRDA, and thus, is conflict preempted. At the outset, we recognize that Vitullo correctly observes that the LMRDA is not applicable to union members when acting in an official capacity, at least to the extent that the LMRDA does not create a right of a particular individual to hold an official position. *See Finnegan*, 456 U.S. at 437-39, 102 S.Ct. at 1871-72, 72 L.Ed.2d at 245-46. Such conclusion, however, does not wholly resolve the issue of conflict preemption, even though Vitullo's present claim is based upon his discharge from his official capacity as an officer, not a member, of the union.

¶27    The LMRDA need not create a right of action for, or otherwise "apply to," those acting in an official capacity in order for Montana law to stand as an obstacle to the accomplishment and execution of the purposes and objectives of the LMRDA. The *Finnegan* Court did not merely hold that the LMRDA applies only to union members and not to members acting in an official capacity, but also determined that the Act had preserved the longstanding practice of union patronage:

> We think it virtually inconceivable that Congress would have prohibited the longstanding practice of union patronage without any discussion in the legislative history of the Act. Had such a result been contemplated, it undoubtedly would have encountered substantial resistance. Moreover, Congress likely would have made some express accommodation to the needs of union employers to appoint and remove policymaking officials . . . . Nothing in the Act evinces a congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies.

*Finnegan*, 456 U.S. at 441-42, n. 12, 102 S.Ct. at 1873, n. 12, 72 L.Ed.2d at 247-48, n. 12 (citation omitted); *also see Screen Extras Guild*, 800 P.2d at 880 ("Replacement of business agents by an elected labor union official is sanctioned by the [LMRDA] and allowance of

11

a claim under state law would interfere with the effective administration of national labor policy." (citing *Tyra*, 153 Cal.App.3d at 923)). The Supreme Court went on to note that Congress, in enacting the LMRDA, "simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff." *Finnegan*, 456 U.S. at 442, 102 S.Ct. at 1873, 72 L.Ed.2d at 248. Thus, it follows that a state law which interferes with the longstanding practice of union patronage, established in the union's democratically enacted constitution, is not only contrary to the overall purpose and objective of the LMRDA as declared by the United States Supreme Court, but is in direct conflict with the democratic process that Congress sought to protect. As noted by the *Finnegan* Court, the union bylaws themselves were a product of a vigorous democratic process and are subject to amendment by a vote of the union membership, and it was the bylaws that granted the president plenary authority to appoint and suspend at will those business agents who have significant responsibility for the day-to-day conduct of union affairs. *Finnegan*, 456 U.S. at 441-42, 102 S.Ct. at 1873, 72 L.Ed.2d at 247-48.

¶28     The Supreme Court of California reached the equivalent conclusion in *Screen Extras Guild*, where, the plaintiff, an employee of the local union but not a member, was discharged for alleged dishonesty and insubordination and thereafter sued the union and its executive secretary on a number of grounds, including a claimed violation of California's wrongful discharge law. *Screen Extras Guild*, 800 P.2d at 874. The California Supreme Court held that the LMRDA preempted the plaintiff's claims. Relying on *Finnegan*, the Court reasoned that elected union officials "must necessarily rely on their appointed representatives to carry

12

out their programs and policies. As a result, courts have recognized that the ability of elected union officials to select their own administrators is an integral part of ensuring that union administrations are responsive to the will of union members." *Screen Extras Guild*, 800 P.2d at 877.

¶29    The court in *Screen Extras Guild* also found persuasive the reasoning in *Tyra*, where the California Court of Appeals held that "replacement of business agents by elected union officials is sanctioned by the LMRDA, and that to allow Tyra's wrongful discharge claim would interfere with the effective administration of national labor policy." *Screen Extras Guild*, 800 P.2d at 878 (citing *Tyra*, 153 Cal.App.3d at 922-23). The California Supreme Court reasoned therefrom that "allowing such claims to proceed in the California courts would 'restrict the exercise of the right to terminate which *Finnegan* found [to be] an integral part of ensuring a union administration's responsiveness to the mandate of the union election.'" *Screen Extras Guild*, 800 P.2d at 880 (citing *Tyra*, 153 Cal.App.3d at 927 and *Finnegan*, 456 U.S. at 441, 102 S.Ct. at 1873, 72 L.Ed.2d at 247) (internal quotations omitted).

¶30    The crux of Vitullo's argument is that he was coerced into forfeiting a right under the IBEW constitution to be nominated for office, and that, being forced to "strip himself of employment  in order to enjoy a right pursuant to their union Constitution" violates public policy. We first note that Vitullo did not forfeit a right guaranteed to him under IBEW's constitution. Rather, he accepted the nomination, a right he retained as a union member, ran for election against Spranget, and thereafter lost the election. Spranget, Vitullo's boss and

13

IBEW's business manager at the time of the election, discharged Vitullo from his position as the assistant business manager pursuant to Article XVI, Section 2, of IBEW's constitution, which provides that the business manager shall appoint any and all representatives or assistants, any of whom may be discharged at any time, and further, that any such officers working under the business manager shall cooperate with and not work in conflict with the manager.

¶31 A state law interfering with the business manager's authority to choose his or her own staff would be in conflict with IBEW's constitution, a document integral to protecting union democracy and responsiveness to its members, and thus, would frustrate the goals and objectives Congress sought to promote in enacting the LMRDA. It follows therefrom, that to the extent that the Montana Wrongful Discharge From Employment Act interferes with the constitutional appointment authority of duly elected union officers, it is in direct conflict with the LMRDA, and is preempted accordingly.

¶32 Based on the foregoing, we hold that under the present facts, the Montana Wrongful Discharge From Employment Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and thus, allowing Vitullo to proceed with his claim under the Act would directly conflict with and frustrate those objectives. We therefore hold that the District Court did not err in granting summary judgment to IBEW, nor in concluding that, under the present facts, the Montana Wrongful Discharge From Employment Act is preempted by the LMRDA.

¶33 The decision of the District Court is affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER